UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

| | |
|---|---|
| THOMAS M. COOLEY LAW SCHOOL, )<br>  )<br>  300 South Capitol Avenue )<br>  Lansing, MI 48901, )<br>  )<br>  *Plaintiff,* )<br>  )<br>  v. )<br>  )<br>COUNCIL OF THE SECTION OF LEGAL )<br>EDUCATION AND ADMISSIONS TO THE BAR )<br>OF THE AMERICAN BAR ASSOCIATION, )<br>  )<br>  21st Floor )<br>  321 North Clark Street )<br>  Chicago, IL 60610-4714, )<br>  )<br>  and )<br>  )<br>THE AMERICAN BAR ASSOCIATION, )<br>  )<br>  321 North Clark Street )<br>  Chicago, IL 60610-4714, )<br>  )<br>  *Defendants.* )<br>  ) | CASE NUMBER   1:05CV02317<br><br>JUDGE: Richard J. Leon<br><br>DECK TYPE: General Civil<br><br>DATE STAMP: 12/02/2005 |

## VERIFIED COMPLAINT

This action unfortunately has become necessary to compel the American Bar Association's law school accreditation entity, the Council of the Section of Legal Education and Admissions to the Bar (ABA or Council), to act upon applications submitted on June 22, 2005, by the Thomas M. Cooley Law School (Cooley) for approval and acquiescence in Cooley's operation of branch law school campuses in

Oakland County and Grand Rapids, Michigan. In direct contradiction of its own written and oral representations to Cooley, the ABA has refused to send a properly constituted site evaluation team and to take other action necessary to evaluate Cooley's June 2005 applications. Further delay will prevent Cooley's applications from being acted upon in time for Cooley to effectively recruit students at Oakland and Grand Rapids for its September 2006 entering classes.

Sadly, the ABA's proclivity to deny Cooley's common-law and statutory right to review of and action on its applications is nothing new. There is a long history of the ABA's undermining Cooley's expansion by burying its applications in a bureaucratic graveyard of broken promises, unnecessary and deliberate delays, changing rules and criteria, secret proceedings and *ex parte* evidence. To protect itself and its students, many of whom are ethnic minorities and economically disadvantaged, Cooley has challenged these prior wrongs by the ABA in separate litigation. That litigation and the acts and omissions that led to it, summarized in paragraphs 13-25 below, are not the subject of this lawsuit. Rather, this lawsuit involves new applications Cooley filed on June 22, 2005 in accordance with the ABA's instructions. Having done what the ABA authorized it to do, Cooley simply requests that this Court order the ABA to play by its own rules and abide by its own commitments.

PARTIES

1. Defendant Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association is an unincorporated entity with its principal place of business in Chicago, Illinois. The Council is nominally the governing body

of a section of the American Bar Association, but, with respect to its accreditation responsibilities, it is a separate and independent entity that is not subject to the Association's control or management. The Council is the recognized accrediting body for American law schools. Most jurisdictions in the United States have determined that graduates of law schools accredited by the Council—known as ABA-approved law schools—are eligible to take its bar exam. The United States Department of Education has recognized the Council as an authority for purposes of accrediting law schools whose students are eligible to participate in DOE programs, including student loans. Thus, the Council's imprimatur is crucial to any law school's ability to attract and retain students and to the students' ability to attend the law school of their choice. The Council routinely conducts business in the District of Columbia.

2. Defendant American Bar Association is an Illinois non-profit corporation with its principal place of business in Chicago, Illinois. The Association has an office in, and routinely conducts business in, the District of Columbia.

3. Plaintiff Thomas M. Cooley Law School is a Michigan non-profit educational corporation with its principal place of business in Lansing, Michigan. It is the nation's largest law school, enrolling more students and more minority students than any other accredited law school. It has students from, and graduates in, every state. Cooley has been an ABA-approved law school since 1975. Cooley is also accredited by the Higher Learning Commission, which is the general accrediting agency recognized by the United States Department of Education to accredit institutions of higher education in Michigan and 18 other states.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1332 and 1367 and 20 U.S.C. § 1099b(f), which grants jurisdiction to review accreditation decisions.

5. Venue is appropriate under 28 U.S.C. § 1391(b).

## THE ACCREDITATION PROCESS

6. The Council is an entity positioned within and elected by the American Bar Association's Section on Legal Education and Admissions to the Bar (Section). It comprises the officers of the Section, 15 at-large members (three of whom must be public members who are neither members of the American Bar Association nor associated with an ABA-approved law school) and one representative of the American Bar Association's Law Student Division. All members of the Council are elected by the members of the Section.

7. The Council grants provisional and full approval to law schools located in the United States, its territories, and possessions. It also adopts the Standards for Approval of Law Schools, the official Interpretations of those Standards and the Rules of Procedure that govern the law school accreditation process. The Council also must grant "prior acquiescence" in any major changes that are proposed by an approved law school.

8. Compliance with the Standards and Interpretations is monitored by the Accreditation Committee, whose members are appointed by the Chairperson of the Section (who also Chairs the Council). The Accreditation Committee also makes recommendations to the Council regarding applications for approval of, and acquiescence in, the establishment of satellite or branch campuses and other major

program changes. Fully approved schools receive a site evaluation in the third year after full approval and every seven years thereafter.

9. Neither the Council nor the Committee has any permanent members or staff. They are assisted by the Consultant on Legal Education to the ABA and his staff, who receive applications for approval or acquiescence, meet with representatives of applicant law schools, and provide applicants with information about the Standards and Interpretations and the accreditation process. The Consultant also coordinates any site evaluation that is required. All acts and omissions attributed to the Consultant and his staff or the Consultant's Office in this complaint were taken by the Consultant and his staff in their capacity as agents of the Council and within the scope of their authority as such.

### CHANGES IN THE STANDARD FOR SEPARATE CAMPUSES

10. Until a few years ago, the Council's Interpretations governing an approved law school's establishment of educational programs at a different location recognized only two possibilities: if the school offered less than 20 percent of its educational program at the new location, it could proceed without additional approval; if it offered 20 percent or more, it was required to obtain prior acquiescence, and subsequent provisional and full approval, based on the Standards governing the establishment of an entirely new law school.

11. In December 2001, the Council proposed new Interpretations under which an approved school could establish a satellite campus offering the first year of its program (first-year satellite) or a satellite campus offering more than the first year but less than two-thirds of its program (two-year satellite). Under either the then-

existing Interpretations or the proposed ones, a law school was authorized to offer up to 15 credit hours of instruction at a separate location without prior acquiescence.

12. The Council circulated these proposals for review and comment by, among others, the Deans of all ABA-approved law schools. The Section's Standards Review Committee received oral comments at hearings held in February and May of 2002. The Council approved the proposed changes in December 2002, and the ABA's House of Delegates gave its concurrence on February 10, 2003, at which time the new Interpretations became effective.

### HISTORY OF EARLIER DISPUTE BETWEEN COOLEY AND THE COUNCIL: COOLEY'S PREVIOUS APPLICATIONS AND ENSUING LAWSUIT, NOW ON APPEAL TO THE SIXTH CIRCUIT

13. As previously noted, there is a long and disturbing history of the ABA and Council burying Cooley's applications in bureaucratic and secret proceedings. Although these due process violations and other wrongs are the subject of separate litigation and are not at issue here, the following brief history provides a useful prologue to the current dispute.

14. In mid-2002, after years of internal study and planning, Cooley decided to open another location at Oakland University in Oakland County, Michigan. Toward that end, Cooley sought guidance from the only ABA entity available for that purpose, the Consultant's Office. The school contacted the Consultant and his staff to discuss the process for obtaining Council approval for additional campuses and to obtain guidance about whether to base its application on the existing Interpretations or the proposed changes.

15. The Consultant's Office informed Cooley in May 2002 that the Section's Standards Review Committee had approved the proposed Interpretations for first- and second-year satellite programs and forwarded them to the Council for final approval, and advised Cooley to structure its application based on the requirements set forth in those new Interpretations.

16. Accordingly, on June 25, 2002, Cooley filed an application for acquiescence in a two-year satellite program at Oakland University. Cooley structured its application around the proposed satellite Interpretations, and the Consultant sent a site inspector to Oakland to review Cooley's plans based on those Interpretations. Cooley subsequently filed a similar application to open a satellite campus in Grand Rapids in partnership with Western Michigan University.

17. Following a site evaluation of Cooley's Oakland County campus, the site inspector sent by the Consultant's Office filed a favorable report based on the new Interpretations that supported Cooley's application and made clear that the facts found satisfied all of the requirements set forth in those Interpretations for a satellite campus. The report also found that the satellite campus would not adversely affect Cooley's operations at its main campus in Lansing.

18. In December 2002, the Council gave its final approval to the proposed satellite campus Interpretations, which were then placed on the February 2003 consent docket of the ABA House of Delegates. The House of Delegates has no authority to reject or change the Standards or Interpretations approved by the Council, but only to concur in them or remand them to the Council for further

consideration; after a second such remand, the Council's subsequent approval is final and unreviewable by the House of Delegates. All parties expected the approved Interpretations to receive the House of Delegates' concurrence and become effective in February.

19. Cooley's Oakland application was considered by the Accreditation Committee in late January 2003 and by the Council in early February 2003. Since (a) the Consultant had advised Cooley to base its application on the new Interpretations and had caused the site evaluator to prepare his report based on them and (b) the new Interpretations were expected to become effective in less than two weeks, Cooley asked both bodies to apply the new Interpretations to its application given the House of Delegates' imminent and expected action. Inexplicably, both the Accreditation Committee and the Council denied Cooley's request, insisting instead on judging Cooley's application by the more onerous Standards governing the establishment of an entirely new law school.

20. This decision by the Accreditation Committee and the Council to use the superseded Standards directly contradicted both the Consultant's previous advice to Cooley and his actions in processing Cooley's application based on the new Interpretations. This presents two possible scenarios: either the Consultant misled Cooley and set it up to fail or the Committee and Council arbitrarily countermanded the Consultant, undermined his authority and arbitrarily judged Cooley's application by the wrong criteria.

21. As expected, the new Interpretations received the ABA House of Delegates' concurrence on February 10, 2003. The Council then formally denied Cooley's application in an action letter dated February 11, 2005, the day after the new Interpretations became effective, basing its decision on the superseded Interpretations.

22. Thereafter, Cooley notified the Council that it was implementing satellite programs offering more than 15 credit hours at Oakland and Grand Rapids, later submitted new applications seeking to operate a full three-year branch campus at each location, and ultimately initiated an action against the ABA in the United States District Court for the Western District of Michigan, seeking to enjoin the ABA from imposing sanctions against Cooley and to require it to expeditiously process Cooley's applications for branch campuses.

23. In that litigation, Cooley and the ABA entered into an agreement in which Cooley agreed to bring its satellite programs at Oakland and Grand Rapids into compliance with the Council's Standards by cutting them back to 15 credit hours and to not reopen the satellite programs without prior acquiescence of the Council. In return, the ABA agreed that the Council would consider Cooley's applications for two-year satellite programs at Oakland and Grand Rapids at its August 2004 meeting.

24. At its August 2004 meeting, the Council imposed sanctions on Cooley for operating satellite programs without prior acquiescence. The sanctions included making Cooley ineligible to operate satellite or branch campuses until August 2006.

The Council declined to act on Cooley's then-pending applications, concluding that they did not provide sufficient information upon which it could rely in making a decision that would not become applicable until 2006.

25. On June 9, 2005, the District Court, without permitting Cooley to take discovery and relying on extra-record material submitted by the ABA and its counsel, granted the ABA's motion for summary judgment. The court then dismissed Cooley's common-law due process claim that the Council had acted arbitrarily and capriciously and contrary to its own rules in denying Cooley's applications and imposing sanctions. Cooley's appeal from that decision is now pending before the Sixth Circuit, which has, at Cooley's request, stayed the district court's judgment, enjoined the ABA from imposing a public censure as part of the sanction imposed against Cooley, and expedited briefing and argument on Cooley's appeal.

26. To repeat, Cooley does not here seek to relitigate any of the issues raised in the foregoing litigation. Rather, as shown below, this lawsuit raises entirely new issues based on Cooley's new applications seeking to operate branch campuses at Oakland and Grand Rapids.

### THE DEPARTMENT OF JUSTICE'S 1995 ANTITRUST ACTION AGAINST THE ABA AND THE RESULTING CONSENT FINAL JUDGMENT

27. In 1995, the Department of Justice concluded that the ABA's law school accreditation program, as it was then carried out, included certain anticompetitive standards and practices. Complaint, *United States v. American Bar Association*, Civil No. 95-1211 (D.D.C. June 27, 1995).

28. One of the anticompetitive problems identified by DOJ in its complaint was that "[l]egal educators, including current and former law school faculty, administrators, and librarians, control and dominate the law school accreditation standard-setting and enforcement process." DOJ Complaint ¶ 9. As the DOJ complaint noted, "The typical site inspection team has 5-7 members, all or nearly all of whom are legal educators." *Id.* ¶ 12. This problem originated in the Consultant's Office, which is responsible for appointing the site evaluation team members. "The Consultant usually selects site evaluation teams composed of law school faculty, administrators, clinicians, and librarians ...." *Id.* ¶ 28.

29. DOJ sought to counteract this undue "guild" influence in the reports generated by site inspection teams, which become the record on which the Accreditation Committee and the Council make their decisions about a school's compliance with the accreditation Standards. Thus, the consent Final Judgment, by which the United States and the ABA settled the action, specifically directed that the ABA "require that each site evaluation team include, to the extent reasonably feasible, at least ...one university administrator who is not a law school dean or faculty member ...and ...one practicing lawyer, judge or public member." Final Judgment § VI(G), *United States v. American Bar Association*, 934 F. Supp. 435, 437 (1996), *modified in other respects*, 135 F. Supp. 2d 28 (D.D.C. 2001).

COOLEY'S NEW APPLICATIONS AND THE DISPUTE ADDRESSED IN THIS LAWSUIT

30. In its August 2004 action letter imposing sanctions and declining to act on Cooley's applications to operate satellite campuses, the Council informed Cooley that it could "in the summer or fall of 2005, [file] a new application for acquiescence

11

in the establishment of one or more satellite or branch campuses, to be operated after July 31, 2006." The Council also noted that Cooley was scheduled for its normal sabbatical review in the fall of 2005 and concluded,

> The sabbatical site evaluation will then provide the [Accreditation] Committee and the Council current information as to whether, at that time, Cooley is in full compliance with the Standards and Rules. The fact-finding reports prepared in connection with the new applications for acquiescence, in combination with the sabbatical site evaluation report, will then provide the basis for determining whether at that time, Cooley satisfies the criteria for acquiescence in the establishment of satellite or branch campuses that are set forth in the applicable Standards and Rules.

31. The Consultant provided similar information to Cooley in a letter dated June 9, 2005:

> [I]n anticipation of [Cooley's] application for acquiescence in the major change associated with the establishment of a Branch Campus, our office has already begun to appoint a team of fact-finders who would undertake the site evaluation that, under Rules 18(e) and (f), must occur before either the Accreditation Committee or the Council consider an application for acquiescence in a major change. ... [W]e plan to schedule that fact-finding and the School's sabbatical site evaluation so that the reports of both visits will be considered by the Accreditation Committee at its April 2006 meeting.

32. In accordance with the directions in the Council's August 2004 action letter, Cooley, on June 22, 2005, submitted applications for acquiescence to operate branch campuses at Oakland and Grand Rapids beginning in September 2006, along with checks totaling $16,000 for the branch-campus application fees required by the Council's rules.

33. By letter dated September 21, 2005, to Cooley, the Consultant identified the members of the site evaluation team for the October 20-21, 2005 visit, which was to review Cooley's proposed programs at the Oakland and Grand Rapids campuses. In a letter dated September 23, 2005, the Consultant identified the members of

12

Cooley's sabbatical site visit team, which was scheduled to conduct its evaluation on October 16-19, 2005. Neither of the teams included a university administrator who is not a law school dean or faculty member or a practicing lawyer, judge or public member.

34. Cooley had its last sabbatical inspection in 1998, and the Council has been aware since then that Cooley's next sabbatical inspection would occur in 2005. In addition, the Council has been aware since August of 2004 that a separate inspection of Cooley's proposed programs in Oakland County and Grand Rapids would be conducted in connection with the regular 2005 inspection. Despite this advance knowledge, the Consultant appointed a total of seven site inspection team members, all of whom were law school deans, associate deans, librarians, and faculty members. Under these circumstances, the Council can hardly claim that it was not "reasonably feasible," see paragraph 29 above, to include at least one university administrator who is not a law school dean or faculty member and one practicing lawyer, judge or public member on Cooley's site inspection teams.

35. In mid-October 2005, Cooley began to experience irregularities similar to those that side-tracked its earlier satellite-campus applications. Prior to the branch-campus team's arrival, the chair of the team informed Cooley that the Consultant's Office had not provided the team with copies of Cooley's branch-campus applications, and that the Consultant had ordered him and his team not to inspect or report on those applications, which Cooley had filed in accordance with the Council's directions.

36. Cooley then contacted the Consultant's Office, which confirmed orally that the site evaluation team had been directed not to inspect or report on Cooley's branch-campus applications.

37. Upon the team's arrival, all three of its members independently confirmed that they had been instructed by the Consultant or his staff not to inspect or report on Cooley's branch-campus applications.

38. Neither the Council nor the Consultant has ever provided Cooley with written notice or confirmation of the oral representations of the team members or the Consultant's office.

39. The Council and the Consultant have thus failed and refused to process Cooley's branch applications in accordance with their own prescribed instructions and procedures. Again, either the Consultant has misled Cooley by first accepting Cooley's applications and the $16,000 in fees and then directing the inspection team not to review or report on those applications or the Council has arbitrarily countermanded the Consultant's directions. Either way, the Council's failure to initiate the accreditation process as scheduled jeopardizes Cooley's ability to effectively recruit new students for classes at its branch campuses starting in September 2006.

40. By failing to follow through on the Council's commitment to process Cooley's new branch-campus applications in conjunction with its sabbatical review, defendants are once again leading Cooley into a labyrinthine process from which it

will be unable to escape with approved branch programs. Any further delay will prevent Cooley from effectively recruiting 2006 fall classes for the branch campuses.

41. By their previous actions, the Accreditation Committee and the Council have confirmed that Cooley is a fully accredited law school currently in compliance with all Standards and Interpretations. Three years and five months have now passed since Cooley filed its original application for acquiescence in a satellite campus at Oakland. During that period, neither the site evaluation teams, the Accreditation Committee nor the Council has ever made a single finding or conclusion that Cooley's proposed programs did not comply with the substantive requirements governing satellite campuses as set forth in the Council's new Interpretations.

## First Claim for Relief
### (Action Improperly Withheld or Delayed)

42. The allegations of paragraphs 1 through 41 are incorporated as if set forth in full here.

43. As an accrediting agency recognized by the Department of Education, the Council must abide by the requirements of common-law due process and fundamental fairness in making decisions that affect the substantial rights of a school and its students. The Council is also required to comply with its own rules in processing applications.

44. The Council's Rules of Procedure envision that an application for the establishment of a new branch campus will be processed for consideration by the Council within 120 days after it is submitted: "A law school's application for

15

acquiescence [in, among other things, the establishment of a branch campus] must be submitted to the Consultant's office at least 120 days prior to a scheduled meeting of the Accreditation Committee in order for the proposal to be considered by the Committee at that meeting." Council Rules of Procedure § 18(c).

45. The Council's Rules further envision that the site evaluation "team shall promptly submit its report to the Consultant" *id.* § 18(i), and that the Consultant shall forward the report to the school for comment at least 45 days prior to the Accreditation Committee meeting, *id.* (providing 30 days for the school to submit its comments on the site evaluation report, which comments must be received by the Consultant at least 15 days prior to the date of the meeting).

46. The Council's rules thus contemplate that, within as few as 75 days after the application is submitted, the site evaluation team will have conducted its evaluation and submitted its report and the Consultant will have reviewed the report and submitted it to the applicant school for comment.

47. The Accreditation Committee is scheduled to meet on January 19-21, 2006. Cooley's applications were submitted on June 22, 2005, giving the Council 211 days in which to process the applications before the Accreditation Committee's scheduled January 2006 meeting. At the time this complaint was filed, more than 140 days had elapsed since Cooley submitted its applications. The team that the Consultant initially appointed to perform the site evaluation for these branch-campus applications was subsequently directed not to inspect or report on these branch-campus applications. If Cooley's applications are to be considered at the

16

Accreditation Committee's January 19-21 meeting, the Council's rules require the site evaluation reports to be submitted to Cooley for comments no later than December 5, 2005.

48. The Council has violated common-law due-process requirements by failing to take timely action on Cooley's June 22, 2005 applications for approval of branch campuses at Oakland and Grand Rapids.

In light of the foregoing, Cooley requests the Court to issue an injunction directing the Council and the ABA to

> a. Complete all required site inspections and fact-finding necessary to process and act upon Cooley's branch-campus applications and forward all site inspection and fact-finding reports to Cooley for review and comment no later than December 21, 2005.
>
> b. Submit Cooley's applications and associated site inspection and fact-finding reports, along with Cooley's responses thereto, for consideration by the Accreditation Committee at its January 2006 meeting.
>
> c. Require the Accreditation Committee (1) to determine whether Cooley's proposed programs meet the substantive requirements for the opening of branch campuses and, if not, whether Cooley's proposed programs meet the requirements for the opening of two-year satellite campuses; and (2) to issue its recommendation to the Council in time for Cooley to respond to that recommendation before the Council's February 2006 meeting.
>
> d. Submit Cooley's branch-campus applications, the Accreditation Committee's recommendations on those applications and Cooley's responses thereto for consideration by the Council at its February 2006 meeting.
>
> e. Require the Council, at its February 2006 meeting, to decide whether Cooley's proposed programs meet the substantive requirements for the opening of branch campuses and, if not, to decide whether Cooley's proposed programs meet the requirements for the opening of two-year satellite campuses.

Further, Cooley requests that the Court order the Council and the ABA to process Cooley's branch-campus applications based upon Cooley's current status as

17

a fully accredited law school that is in compliance with all Standards and Interpretations, so that any delays in the review of Cooley's sabbatical site visit will not further delay review of the branch-campus applications.

Alternatively, based on the Council's long delay in acting on the merits of Cooley's applications and the absence of any findings, in previous site evaluations and reviews by the Accreditation Committee or the Council, that Cooley's applications or its proposed programs failed to satisfy the Council's satellite-campus Interpretations, Cooley requests the Court to order the Council to acquiesce in Cooley's branch-campus applications and grant provisional approval to both campuses.

## SECOND CLAIM FOR RELIEF
### (PROMISSORY ESTOPPEL)

49. The allegations of paragraphs 1 through 41 are incorporated as if set forth in full here.

50. The Council specifically authorized Cooley to file, in the summer or fall of 2005, applications for branch campuses, and promised that such applications would be processed so that operations at those campuses could begin as early as August 1, 2006.

51. The Council expected, or reasonably should have expected, that the foregoing promise would induce Cooley to take action of a definite and substantial character.

52. Cooley did in fact take such definite and substantial actions, in reliance on the Council's promise. These actions included (a) preparing the applications and

related questionnaires; (b) paying the $16,000 fees for the applications; (c) acquiring, expanding or constructing facilities; (d) hiring additional faculty and staff; (e) purchasing additional library materials; and (f) preparing the proposed campuses for inspection by a site evaluation team.

53. Under the circumstances, the Council's promise must be enforced if injustice is to be avoided.

In light of the foregoing, the Court should specifically enforce the Council's promise and order it to process Cooley's branch-campus applications (in accordance with the schedule set forth in Count I above) so that, if the Council approves the applications, Cooley may commence operations at the branch campuses beginning no later than August 1, 2006.

*/s/ Alex Blanton*
Alex Blanton, D.C. Bar No. 169623
Michael L. Cioffi
BLANK ROME, LLP
  600 New Hampshire Ave., NW
  Washington, D.C. 20037
  202-772-5909
  Fax: 202-572-8357
  Email: Blanton@BlankRome.com

## VERIFICATION

State of Michigan  )
                       ) ss
County of Oakland )

John Nussbaumer declares as follows:

1. I was the Associate Dean of Faculty of plaintiff Thomas M. Cooley Law School until April 30, 2003 and since then have served as the Associate Dean at Rochester/Oakland University.

2. I am authorized by Thomas M. Cooley Law School to verify the foregoing Complaint.

3. I have read the foregoing Complaint and verify that the allegations set forth therein are true and correct to the best of my knowledge, information and belief, and if sworn as a witness, I can testify competently as to those facts.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Rochester Hills, Michigan on November 29, 2005.

_____
John Nussbaumer

Subscribed and sworn to before me this 29th day of November, 2005

_Renata C. Erickson_

Notary Public, Oakland County, Michigan
My Commission Expires: 11·22·10

RENATA C. ERICKSON
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Nov 22, 2010
ACTING IN THE COUNTY OF Oakland