# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| THOMAS M. COOLEY LAW SCHOOL,<br><br>Plaintiff,<br><br>v.<br><br>COUNCIL OF THE SECTION OF THE LEGAL EDUCATION AND ADMISSIONS TO THE BAR OF THE AMERICAN BAR ASSOCIATION,<br><br>and<br><br>THE AMERICAN BAR ASSOCIATION,<br><br>Defendants. | Case No. 1:05CV02317<br><br>Hon. Richard J. Leon |

**DECLARATION OF JOHN A. SEBERT IN SUPPORT OF DEFENDANT AMERICAN BAR ASSOCIATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, John A. Sebert, hereby state and declare as follows:

**Introduction**

1.   I am the Consultant on Legal Education ("Consultant") to the American Bar Association ("ABA"). I was named to this position in March 2000 and served as Consultant-Designate until September 2000, when I assumed my current position. Prior to being named Consultant, I served as Dean and Professor of Law at the University of Baltimore School of Law from 1993-2000.

2.   From 1974-93, I was on the faculty of the University of Tennessee College of Law. I also served as Deputy Director of the Association of American Law Schools ("AALS") from 1990 to 1992, while on leave from Tennessee. Before joining the University of Tennessee

College of Law, I taught at the University of Minnesota Law School from 1970-74 and served as an attorney-advisor in the General Counsel's Office of the Department of the United States Air Force from 1967-70.

3. The facts set forth in this Declaration are based on my personal knowledge and my review of records of the regularly conducted activities of the ABA. If called on to testify as a witness, I can testify competently to the matters and facts set forth in this Declaration. This Declaration is submitted in support of the ABA's Opposition to Plaintiff Thomas M. Cooley Law School's ("Cooley") Motion for Preliminary Injunction in the above-captioned case.

**Procedures For The Approval Of Law Schools By The ABA**

4. A law school's decision to seek ABA accreditation (known as "approval") is entirely voluntary. Although the ABA provides the results of its accreditation process to bar admission authorities, the ABA's recommendations on accreditation are not binding on these authorities. While many state authorities consider graduation from an ABA-approved law school as a way of satisfying the legal education requirement for taking the bar examination, the decision whether to consider ABA approval and the weight to be accorded such approval always rests with the state authorities, not the ABA. The ABA's accreditation decisions provide information about the quality and choices available in law school education, so that current and prospective law students, as well as the public that uses the services of law school graduates, can make better-informed decisions. The ABA's accreditation decisions are also supplied to the United States Department of Education. The accreditation process includes both the approval of law schools and the acquiescence in major changes sought by approved law schools.

5. A true and correct copy of the current version of the ABA's Standards for Approval of Law Schools ("Standards") is Exhibit 3 to Defendants' Opposition To Plaintiff's

1

Motion For Preliminary Injunction. In applying the Standards to matters before them, the Council ("Council") of the Section of Legal Education and Admissions to the Bar ("Section") and the Accreditation Committee of the Section ("Accreditation Committee") develop interpretations ("Interpretations"), a copy of which accompany the Standards in Exhibit 3. The Standards and Interpretations describe the requirements a law school must meet to obtain and retain ABA full and provisional approval. (*See* Exhibit 3, Standards 101 and 102).

6. A true and correct copy of the ABA's Rules of Procedure for Approval of Law Schools ("Rules"), which implement the Standards, is Exhibit 4 to the Appendix.

7. The Standards, Interpretations, and Rules were adopted only after undergoing an extensive public comment and review process and being concurred in by the ABA's House of Delegates (the "House"). As part of this process, the Section has a committee, the Standards Review Committee, that is responsible for reviewing the Standards, Interpretations and Rules and drafting proposed revisions. The ABA then circulates these proposed revisions to the chief judge of every state supreme court, the deans of every ABA-approved law school, the chairs of the board of bar examiners of every state, and members of the Section. After comment and public hearings, the Standards Review Committee forwards its recommendations to the Council. The Council reviews the comments and the Standards Review Committee's recommendations before adopting final revisions to the Standards, Interpretations and Rules. The adopted revisions are then put before the House, which may either concur in the revisions or refer them back to the Council for reconsideration based on reasons specified by the House.

8. In order to receive provisional approval, a law school must (i) establish that it is in substantial compliance with each of the Standards and (ii) present a reliable plan for coming into full compliance with the Standards. (*See* Exhibit 3, Standard 102(a)). Once a school is granted

provisional approval, it has five years to qualify for full approval, which requires "full compliance" with the Standards. (*Id.*, Standards 102(b)). A law school that is provisionally or fully approved must be "operated in compliance with the Standards." (*See id.*, Standard 101).

**Prior Acquiescence in a Major Change**

9. Standard 105 states that: "Before a law school makes a major change in its program of legal education or organizational structure, it shall obtain the acquiescence of the Council for the change." (*See id.*, Standard 105). The requirement of prior acquiescence contained in the first sentence of current Standard 105 has been in effect continuously from well before 2000 to the present. The remainder of current Standard 105 was added in August 2005, replacing in part the provisions of former Rule 18(p), which was deleted.

10. A list of examples of major changes is set forth in Interpretation 105-1, and includes the "[o]pening of a Branch campus or Satellite campus." (*See* Exhibit 3, Interpretation 105-1(13)). A "Branch campus" is a "separate location at which a law school offers sufficient courses that a student could earn at the separate location all of the credit hours that a law school requires for the J.D. degree." (*Id.*, Standard 106(4)). A "Satellite campus" is a "separate location ... at which a law student could take the equivalent of 16 or more semester credit hours toward the law school's J.D. degree but which does not constitute a Branch campus." (*Id.*, Standard 106(14)). Thus, under Standard 105 and Interpretation 105-1, a law school seeking to open a Branch or Satellite campus (i.e. a separate location at which a law school offers the equivalent of 16 or more credit hours) must obtain prior acquiescence. Prior acquiescence is not required where a law school proposes to offer less then 16 credit hours at another location.

11. Since 1952 the Council has been recognized by the United States Department of Education ("DOE") as the national agency for the accreditation of professional schools of law.

3

It is the Council and not the ABA that is so recognized. The DOE has issued regulations relating to certain provisions of the Higher Education Act Amendments of 1992. These regulations provide, in part, that a DOE-recognized accrediting agency, such as the Council, "must maintain adequate substantive change policies that ensure that any substantive change to the educational mission, program, or programs of the institution after the agency has accredited or preaccredited the institution does not adversely affect the capacity of the institution to continue to meet the agency's standards." *See* 34 C.F.R. § 602.22(a). The DOE regulations further state that:

> "The agency meets this requirement if -- (1) *the agency requires the institution to obtain the agency's approval of the substantive change before the agency includes the change in the scope of accreditation or preaccreditation it previously granted to the institution; and (2) The agency's definition of substantive change includes at least the following types of change: . . . . (vii) The establishment of an additional location geographically apart from the main campus at which the institution offers at least 50 percent of an educational program.*"

*Id.* (emphasis added).

12.     The Rules, Standards and Interpretations govern the procedure for considering a school's request for prior acquiescence in the opening of Branch or Satellite campuses. First, a school must apply for prior acquiescence. (Exhibit 4, Rule 18(a)). Next, the ABA appoints a fact-finding team which conducts a site visit at the school. (*Id.*, Rule 18(f)-(g)). After this visit, the fact-finding team prepares and issues a report, which is sent to the school for comment. (*Id.*, Rule 18(h)-(i)). This report, along with the school's comment on the report and application itself, is then provided to the Accreditation Committee (the "Committee"). (*Id.*, Rule 18(j), (*l*)). The Committee then considers the application at a meeting and makes a recommendation to the Council on the application. (*Id.*, Rule 18(o)). This recommendation is then considered by the Council, which also receives the application, the report by the fact-finding team, and the school's

4

comments on the report. (*Id.*, Rule 18(r)-(s)). The Council makes the final determination regarding the application for prior acquiescence.

13. The agenda for the Committee's meetings regarding applications for prior acquiescence is controlled by the Consultant and the Chair of the Accreditation Committee, not by the Council. The agendas for the Committee meetings are typically set many months in advance of the meetings.

14. The Accreditation Committee typically holds four action meetings per academic year, in late October or early November, January, April, and June. The Committee also holds a retreat in early October and sometimes considers school matters during that retreat. The Council typically meets four times per academic year, in December, February, June, and August.

**Cooley's 2002-2003 Applications for Prior Acquiescence**

15. On June 25, 2002, Cooley submitted an application requesting prior acquiescence in the establishment of a two-year satellite campus at Oakland University in Oakland County, Michigan. On July 25-26, 2002, an ABA site evaluator visited the proposed campus at Oakland University and prepared a written report. In October 2002, the Accreditation Committee considered Cooley's application. On November 6, 2002, the Accreditation Committee issued a written report that was sent to Cooley. The Accreditation Committee recommended against granting prior acquiescence and made 29 specific findings of fact regarding the proposed satellite program. Cooley responded to this written report on November 20, 2002.

16. On December 6, 2002, Cooley appeared before the Council in response to the Accreditation Committee's recommendation against prior acquiescence. Following that meeting, the Council remanded the matter to the Committee to consider additional evidence that Cooley presented to the Council on December 6, 2002. Cooley requested that the Council allow students

to continue at Oakland University under a "variance" pursuant to Standard 802. The Council denied this request.

17.  On December 9, 2002, Cooley applied for acquiescence in another satellite campus, this one in Grand Rapids, Michigan.

18.  The Accreditation Committee met on January 24, 2003 to again consider Cooley's request for prior acquiescence in the Oakland satellite program. The Committee issued a report on February 3, 2003 recommending against prior acquiescence and making 28 factual findings regarding the proposed satellite program. On February 8, 2003, the Council adopted the Committee's recommendation and denied acquiescence in the Oakland satellite campus.

19.  The Accreditation Committee and Council reviews were conducted in accordance with the Standards and Rules that were then in effect, which did not include certain proposed Interpretations that had not yet been approved regarding satellite campuses. These proposed Interpretations were not finalized and did not become effective until they were concurred in by the House at its February 10, 2003 meeting, which took place after the Council meeting on February 8-9, 2003.

20.  Neither I nor any one from the Consultant's office represented to Cooley that its application would be evaluated based on proposed Interpretations that had not yet become effective. To the contrary, I explained to Cooley prior to the December 2002 Council meeting that the *existing* Standards and Rules were being used to evaluate its application because the proposed Interpretations regarding satellite programs had not yet been adopted. I also sent a letter dated January 8, 2003 specifically informing Cooley that the Accreditation Committee would review Cooley's application at the January Committee meeting under the existing

Standards, Interpretations and Rules because the new Interpretations would not become effective until concurred in by the House of Delegates in February.

21. On February 8, 2003, the same day the Council denied Cooley's request for prior acquiescence, Cooley informed the ABA that Cooley would commence satellite programs in Oakland and Grand Rapids, despite the Council's denial of the Oakland application and the lack of prior acquiescence in operation of the Grand Rapids satellite program.

22. On February 11, 2003, Cooley further advised the ABA that Cooley intended to open a branch campus (*i.e.*, a school where students could complete all of the education for a juris doctor degree) in Oakland beginning sometime in February 2003.

23. I promptly responded, in two letters dated February 19, 2003, strongly stating the view that doing so would violate the requirement of prior acquiescence set forth in Standard 105. That view was restated in a letter sent by the Chair of the Council, E. Thomas Sullivan, to Cooley President and Dean Don LeDuc dated March 24, 2003. By those letters, the School was clearly put on notice that opening a branch campus without prior acquiescence violated Standard 105 and could subject the school to sanctions.

24. In August 2003, I first became aware that Cooley was in fact continuing to operate unapproved satellite campuses, after receiving a report in connection with site visits made in late July 2003. I promptly wrote to Cooley regarding these apparent serious violations of Standard 105 and informing Cooley that the matter would be referred to the Accreditation Committee "forthwith."

25. In October 2003, Cooley again applied for "prior" acquiescence in satellite programs to be operated in Grand Rapids and Oakland.

7

26. On November 7, 2003, the Accreditation Committee again reviewed Cooley's applications for operation of satellite programs in Oakland and Grand Rapids. By the time of its review, the Committee had learned that Cooley was operating these programs beyond the 15 credit limit without prior acquiescence of the Council, in violation of Standard 105 and Interpretation 105-1(13). Because Cooley was then operating in violation of the Standards, it could not comply with the requirements to obtain acquiescence in a major change. Therefore, on November 19, 2003, the Committee recommended that the Council not acquiesce in the creation of the two satellite campuses.

27. At that time, the Committee also requested that Cooley appear before the Committee at its January 2004 meeting pursuant to Rule 11(b) and show cause why Cooley should not be sanctioned for its failure to comply with the Standards and Rules.

28. Cooley appeared before the Council on December 5, 2003, to respond to the Committee's November 19 recommendations. On December 17, 2003, the Council informed Cooley that the Council denied acquiescence in Cooley's operation of the Grand Rapids and Oakland satellite programs. The Council also directed Cooley to appear before the Committee at the January 23, 2004 "show cause" hearing. Finally, the Council informed Cooley that, because of Cooley's continuing violation of Standard 105's requirement that Cooley obtain prior acquiescence in operating a satellite campus, no further action would be taken on Cooley's October 2003 applications for prior acquiescence until Cooley came into compliance with the Standards.

29. Cooley nonetheless continued to operate the Oakland and Grand Rapids satellite campuses.

**Cooley's First Legal Action**

30.  On March 30, 2004, shortly before the Committee was schedule to hold the sanctions hearing, Cooley file a civil action against the ABA and me in the United States District Court for the Western District of Michigan, Case No. 01:04-CV-00221 ("Michigan Action").

31.  On April 16, 2004, the district court held a hearing on Cooley's motion for preliminary injunction. After the hearing, the parties entered into a Stipulation and Agreed Order whereby Cooley agreed to reduce its programs at Oakland and Grand Rapids "effective immediately" so that no student could earn more than 15 credit hours at either campus. Cooley further agreed that it would not expand the programs without prior acquiescence.

32.  At the district court's suggestion, the ABA agreed that the Accreditation Committee would defer the sanctions hearing until June 2004. The Agreed Order provided that the Council would consider Cooley's then-pending applications for prior acquiescence at the Council's August 2004 meeting.

33.  On June 25, 2004, the Accreditation Committee held hearings on whether to impose sanctions and on Cooley's applications for prior acquiescence. On June 30, 2004, the Committee recommended that the Council deny prior acquiescence in the Grand Rapids and Oakland satellite campuses. The Committee also recommended that the Council sanction Cooley by (a) censuring Cooley, and (b) prohibiting Cooley from operating any satellite or branch campuses before September 2005.

34.  On August 5, 2004, the Council held hearings on the sanctions and Cooley's applications for prior acquiescence. The Council issued its final decision via letter dated August 17, 2004. (*See* Exhibit 5). The Council censured Cooley and prohibited Cooley from operating satellite or branch campuses prior to July 31, 2006. Regarding Cooley's applications for prior

acquiescence, the Council declined to act on those applications because – given that Cooley could not operate a satellite or branch campus until after July 31, 2006 – the information provided in Cooley's then-pending applications was an insufficient basis to decide whether Cooley met the requirements set forth in the Standards and Rules for acquiescence in the operation of satellite campuses that could not begin operation for almost two years.

    35.    The August 17, 2004 letter clearly set forth the time frame for Cooley to again apply for prior acquiescence to operate branch or satellite campuses. The letter provided that "Cooley may file in the summer or fall of 2005 a new application for acquiescence in the establishment of one or more satellite or branch campuses, to be operated after July 31, 2006." The letter noted that "Cooley is scheduled for its next sabbatical site evaluation in the fall of 2005, and it is anticipated that the site evaluation report will be before the Accreditation Committee *in the spring of 2006*." (Exhibit 5 p. 2 (emphasis added)). Sabbatical site evaluations are regularly scheduled assessments of ABA-approved law schools that allow the ABA to monitor the adherence of schools to the Standards and Interpretations. "The fact-finding reports prepared in connection with the new applications [in 2005] for acquiescence, in combination with the sabbatical site evaluation report, will then provide the basis for determining whether, at that time, Cooley satisfies the criteria for acquiescence in the establishment of satellite or branch campuses that are set forth in the applicable Standards and Rules." (*Id.*). Therefore, Cooley has been on notice since at least August 17, 2004 that Cooley's future applications for prior acquiescence would not be considered until Spring 2006.

    36.    On August 26, 2004, Cooley sought to lift the stay in the Michigan Action and filed an Amended Complaint (attached hereto as Exhibit 6), claiming that all of the ABA's actions in response to Cooley's applications were improper, including the sanctions imposed on

Cooley and the timeframe established in the August 17, 2004 letter. The amended complaint asserted one count against the ABA for violation of Cooley's common law due process rights with regard to Cooley's applications for prior acquiescence. The amended complaint also purported to assert claims for breach of the Stipulation and Agreed Order, violation of the Higher Education Act, breach of contract, negligent misrepresentation, and equitable estoppel.

37.    The ABA moved for summary judgment on Cooley's claim for violation of due process, while Cooley cross-moved for summary judgment on this claim. The ABA moved for dismissal of all other counts in the amended complaint. The district court concluded that the ABA was "entitled to judgment as a matter of law, upholding all of its decisions over Cooley's challenge," granting summary judgment for the ABA on Cooley's due process claim and dismissing Cooley's other claims. 376 F. Supp. 2d 758 (W.D. Mich. 2005) (attached hereto as Exhibit 1).

38.    In its opinion, the district court concluded that as a matter of law the ABA's actions in response to Cooley's applications for prior acquiescence did not violate Cooley's due process rights. In particular, the court quoted at length from the August 17, 2004 letter from the ABA to Cooley, which established the timeframe for consideration of future applications from Cooley. The court concluded that "the Council's decision to defer action until *the Spring of 2006*, when it would have the benefit of Cooley's next Fall 2005 sabbatical site evaluation report, is adequately explained and makes eminent sense. Then, *in closer proximity to the Fall of 2006*, when Cooley would next be eligible to operate the satellite campuses, the Council would be able to assess then-current information." 376 F. Supp. 2d at 773 (emphasis added). Thus, the district court approved the ABA's decision that Cooley's future applications would be acted on in *Spring 2006* with an eye toward Cooley operating satellite or branch campuses in Fall 2006.

11

39. Cooley appealed the district court's decision to the United States Court of Appeals for the Sixth Circuit. (*See* Exhibit 7). The parties have completed briefing on Cooley's appeal and the appeal is currently pending before the Sixth Circuit.

**Cooley's 2005 Applications for Prior Acquiescence**

40. In May 2005, Cooley contacted me and advised that Cooley intended to file new applications for prior acquiescence in the opening of branch campuses in Oakland and Grand Rapids. Cooley requested guidance concerning the procedures applicable to these applications.

41. I responded to Cooley's request via letter dated June 9, 2005. (*See* Exhibit 8). In that letter, I detailed the procedures and timeframe for consideration of Cooley's applications for prior acquiescence. I notified Cooley that the ABA was in the process of appointing a fact-finding team to undertake a site evaluation and provide a report to the Accreditation Committee and the Council. (*Id.* p. 1). I informed Cooley, consistent with the ABA's August 17, 2004 letter to Cooley, that "we plan to schedule the fact-finding and [Cooley's regularly scheduled] sabbatical site evaluation so that the reports of both visits will be considered by the Accreditation Committee *at its April 2006 meeting*." (*Id.*). Thus, Cooley was again put on notice on June 9, 2005, that Cooley's new applications would be considered at the April 2006 Committee meeting. Cooley did not object to this schedule after receiving my June 9, 2005 letter.

42. After Cooley received the ABA's June 9, 2005 letter regarding the timeframe for Cooley's application, Cooley submitted new applications on June 22, 2005 for prior acquiescence in the opening of branch campuses at Grand Rapids and Oakland.

43. The ABA proceeded to appoint separate teams to conduct (a) Cooley's regularly scheduled sabbatical site visit (Sabbatical Team), and (b) fact-finding site evaluations for Cooley's applications for prior acquiescence (Fact-Finding Team).

12

44. On September 23, 2005, the ABA informed Cooley of the composition of the two teams and the schedules for their visits. The Sabbatical Team was scheduled to visit Cooley from October 16-19, 2005, and was comprised of Dean Thomas F. Guernsey of Albany Law School (acting as Chair), Professor McKen Carrington of Texas Southern University, Professor Eric Easton of the University of Baltimore, Professor Penny Hazelton of the University of Washington, and Professor Joseph Tomain of the University of Cincinnati. The Fact-Finding Team was scheduled to visit Cooley from October 20-21, 2005, and was comprised of Professor Malcolm Morris of Northern Illinois University College of Law (acting as Chair), Dean Guernsey, and Professor Sarah K. Wiant of Washington & Lee University School of Law. The members of both the Fact-Finding Team and the Sabbatical Team are law school deans, associate deans, professors and librarians who are not employees of the ABA and who act as unpaid volunteers.

45. In compiling these teams, the ABA endeavored to include a practicing lawyer or judge on the Sabbatical Team. As was explained in a memorandum from the ABA to Cooley's dean, "[i]n spite of diligent efforts [the ABA has] not been able to add a practicing lawyer or judge to the Thomas Cooley team." (Exhibit 9 p. 1).

46. The Fact-Finding Team was provided written material in advance of its site visit. In accordance with normal practice, this material included the applications for prior acquiescence that Cooley filed in June 2005 and the "major change questionnaire" that accompanied those applications.

47. The Fact-Finding Team conducted its site visit at Cooley on October 20-21, 2005. The ABA instructed the Fact-Finding Team to consider and report on Cooley's applications for prior acquiescence in opening branch campuses in Grand Rapids and Oakland. Contrary to what

Cooley alleges in its Complaint in this action, the ABA never instructed the Fact-Finding Team to refrain from considering or reporting on Cooley's branch campus applications. In fact, Cooley's desire for prior acquiescence in the branch campuses was the basis of the ABA's June 9, 2005 letter to Cooley that set forth the procedures – including the Fact-Finding Team visit – for applications Cooley was considering filing.

48. The Fact-Finding Team is currently drafting a report based on its visit to Cooley. It is my understanding that this report will address Cooley's applications for prior acquiescence in branch campuses in Grand Rapids and Oakland.

49. The report from the Fact-Finding Team is scheduled to be completed sometime in January 2006. The report will then be sent to Cooley for its comment. After receiving Cooley's comments, the report and Cooley's applications for prior acquiescence will be considered at the Accreditation Committee's April 2006 meeting, as was explained to Cooley in the ABA's August 17, 2004 and June 9, 2005 letters.

50. The report from the Sabbatical Team is also scheduled to be provided to the ABA in January 2006 and considered by the Accreditation Committee at its April 2006 meeting.

51. After its April 2006 meeting, the Committee will issue recommendations on Cooley's applications for prior acquiescence. Those recommendations will be considered by the Council at its June 2006 meeting. This timeframe is exactly as communicated to Cooley on August 17, 2004 and June 9, 2005.

52. Although Cooley's Complaint suggests that Cooley's applications for prior acquiescence should be considered at the January 2006 Accreditation Committee, that is inconsistent with the timeframe previously communicated to Cooley and would be impossible in any instance. The ABA initially prepared agendas for the January and April 2006 Committee

14

meetings in August 2005. At that time, Cooley's applications for prior acquiescence were placed on the April 2006 agenda, while other accreditation requests for which reports would be completed earlier were set on the January 2006 agenda. On December 7, 2005, the ABA finalized the agenda for the January 2006 Committee meeting.

53. The January 2006 Accreditation Committee agenda is already full. There are three matters to be considered at that meeting that involve appearances by school representatives, including one application for full approval of a law school and two applications for provisional approval of new law schools. The January agenda also includes consideration of four sabbatical site evaluation reports (all of which have been received and sent to schools for their response) and fourteen other matters. The reports for all of the applications have already been provided to the ABA, unlike the reports from the Fact-Finding Team and the Sabbatical Team regarding Cooley.

54. In addition to the fact that the January 2006 Accreditation Committee agenda is already full, there is not enough time to process the reports from the Fact-Finding Team and the Sabbatical Team before that meeting. Even if the Sabbatical Team and the Fact-Finding Team could provide their reports to the ABA today (which they cannot), the ABA would need a minimum of six weeks before those reports would be ready for review by the Accreditation Committee. Upon receipt of site visit reports, the ABA's Office of the Consultant reviews the reports for completeness; the ABA's General Counsel's office then reviews the reports. These internal ABA steps take a minimum of two weeks. The reports are then provided to the applicant schools for review and comment. In the case of a sabbatical visit report, the school must be provided a minimum of 30 days to review and comment on the report. (Exhibit 4, Rule 2(e)). These 30 days plus the two weeks for internal ABA review extend past the Committee's January

19-21, 2006 meeting. In addition, the reports, the school's comments, and other materials are provided in advance of the meeting to a member of the Committee (the "monitor") who is responsible for preparing draft decision or recommendation letters that are circulated to all members of the Committee approximately two weeks prior to the meeting. Such materials for the January 2006 meeting have already been distributed to Committee monitors so that they may prepare their drafts for distribution to the Committee early in January.

55. Cooley's Complaint also suggests it is entitled to have its applications considered at the January 2006 Accreditation Committee meeting because Cooley filed those applications more than 120 days prior to that meeting. Cooley's suggestion is based on a misunderstanding of the Rules. Rule 18(c) states that a "law school's application for acquiescence must be submitted to the Consultant's office at least 120 days prior to a scheduled meeting of the Accreditation Committee in order for the proposal to be considered by the Committee at that meeting." (Exhibit 4, Rule 18(c)). Clearly, this Rule establishes a *minimum* amount of time that a school must allow before the Committee will consider an application for prior acquiescence. This Rule does not establish a *maximum* amount of time that can transpire between the application and the Committee's consideration of the application. Indeed, Rules 18(b)-(d) are entirely directed at the applying school, not the Committee or the Council.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 19, 2005.

_____
JOHN A. SEBERT