# Exhibit 6

# UNITED STATES DISTRICT COURT
## THE WESTERN DISTRICT OF MICHIGAN

THOMAS M. COOLEY LAW SCHOOL,  )
a Michigan non-profit corporation,  )  Case No. 04-CV-0221
  )
Plaintiff,  )  Honorable David W. McKeague
  )
v.  )
  )
THE AMERICAN BAR ASSOCIATION,  )
an Illinois non-profit corporation, JOHN  )
SEBERT, individually and in his official  )
capacity,  )
  )
Defendants.  )
_____ )

MILLER, CANFIELD, PADDOCK and STONE, P.L.C.
Michael W. Hartmann (P25373)
Sonal Hope Mithani (P51984)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
313.963.6420
Fax: 313.496.7500
Attorneys for Plaintiff
_____ /

There is no other pending or resolved civil action arising out
of the transaction or occurrence alleged in this Complaint

_____
Michael W. Hartmann

# FIRST AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND JURY DEMAND

## SUMMARY OF COMPLAINT

1.    In this lawsuit, the Thomas M. Cooley Law School ("Cooley") seeks judicial review of a series of actions and decisions by the American Bar Association ("ABA") improperly denying Cooley acquiescence to operate two-year satellite campuses at Rochester/Oakland University and Grand Rapids/Western Michigan

University and improperly sanctioning Cooley for operating these satellite campuses without prior acquiescence. The most recent decisions were issued by the ABA in action letters dated August 17, 2004.

2.    Cooley requests this Court to reverse the actions of the ABA; to permanently enjoin the ABA from imposing sanctions against Cooley or taking any action to restrict the operation of Cooley's two-year satellite programs at Oakland and Grand Rapids; to declare that Cooley's satellite campus applications meet all applicable ABA Standards and Interpretations; to order the ABA to grant acquiescence in the satellite campuses at Oakland and Grand Rapids; to order the ABA to grant acquiescence in the Oakland and Grand Rapids branch campus applications; and to require the ABA to schedule a site visit to review Cooley's request for provisional approval of its branch campus applications (which should have been completed by January 15, 2004 under the ABA's own rules) within 30 days after entry of the order granting acquiescence, to review those applications at the April 2005 Accreditation Committee meeting, and to make a decision on those applications at the June 2005 Council meeting. Cooley also requests this Court to award Cooley damages and any additional relief it deems appropriate, including costs, interest, and attorneys' fees sustained on account of having to bring this action.

## PARTIES, JURISDICTION AND VENUE

3.    Plaintiff, Cooley, is a Michigan non-profit educational corporation with its principal place of business in Lansing, Michigan. An ABA-accredited law school since 1975, Cooley provides its students, over 70% of whom hail from states other than Michigan, with the academic knowledge, practical skills, and professional ethics needed

2

to competently and ethically practice law. With nearly 90 full-time faculty members, over 100 adjunct faculty members, and access to over 500,000 volumes of legal resources in its library collections, Cooley is well-equipped to offer part-time and full-time programs to its students on a year-round basis. Cooley's J.D. program is the largest and one of the most ethnically diverse in the country and is comprised of students from all 50 states and a dozen foreign countries. Cooley's graduates practice law all over the nation. In June 2003, the ABA granted acquiescence to Cooley to establish two LL.M. programs at Cooley's Oakland campus, which under the ABA's own rules required the ABA to find that Cooley's existing J.D. program *exceeded* the standards and interpretations for approval of law schools. And, in November 2003, as part of the periodic re-inspection process that all accredited law schools undergo, the ABA reconfirmed that Cooley met or exceeded all of the standards and interpretations for approval of law schools and remained on the list of approved schools.

4. Defendant, the American Bar Association ("ABA"), is an Illinois non-profit corporation that does business in Michigan and has its principal place of business in Chicago, Illinois. The ABA is organized into divisions, sections, and offices, among them the Section of Legal Education and Admissions to the Bar.

5. The Council of the ABA Section of Legal Education and Admissions to the Bar ("Council") is an accrediting agency under 20 U.S.C. § 1099b and is recognized by the United States Department of Education as the accrediting agency for professional law-degree programs. Decisions concerning the approval of law schools and the acquiescence in major changes such as the operation of satellite and branch campuses are made by the Council, not the ABA House of Delegates.

3

6. The Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar ("Committee") reviews applications for acquiescence in major changes in program or organizational structure and makes recommendations to the Council about whether those applications should be granted.

7. The membership of the Council and the Committee are not controlled by the President of the ABA or the House of Delegates. The President may nominate individuals for membership on the Council or the Committee, but those nominations can be and have been ignored by the Section's nominating committee.

8. The decisions of the Council and the Committee are not controlled by and cannot be reversed by the ABA House of Delegates. The only power the House has is to refer back to the Council a Council decision to amend the standards, interpretations, and rules or a Council decision to place a school on, or remove a school from, the list of approved law schools. After the referral process occurs, any subsequent decision by the Council is final and unreviewable by the House.

9. Defendant John Sebert is a resident of Illinois and serves as the Consultant on Legal Education to the ABA, whose role is "to effectively administer the accreditation of law schools project of the American Bar Association and to provide service, information and consultation to the American Bar Association, to bar admitting authorities, and to law schools relating to legal education in the United States."

10. Jurisdiction exists under 28 U.S.C. § 1331 and 20 U.S.C. § 1099b(f), which grants this Court jurisdiction to review accreditation decisions, and 28 U.S.C. § 1332.

11. The amount in controversy exceeds Seventy Five Thousand ($75,000.00) Dollars, exclusive of interest, costs, and attorney fees.

4

12.    Venue is appropriate under 28 U.S.C. § 1391(b).

## THE ABA ACCREDITATION PROCESS

13.    The accreditation process undertaken by the ABA includes the approval of

law schools and acquiescence in major changes sought by approved law schools.  The

majority of states rely upon the ABA's approval of a law school to determine whether an

applicant has satisfied the state's legal education requirement for admission to the

practice of law.  For example, in Michigan, an applicant for admission to the practice of

law must obtain a J.D., LL.B. or LL.M. degree from a "reputable and qualified law

school."  Under Michigan law, a law school that is approved by the ABA is "reputable

and qualified."

14.    The Council approves law schools or grants acquiescence pursuant to

certain policies and procedures that are collectively referred to as the "Standards for

Approval of Law Schools."  Included among these polices and procedures are standards

and interpretations establishing substantive requirements and rules of procedure for

processing applications for approval or acquiescence,  all of which are promulgated by

the Council.

15.    Once a law school is accredited, compliance with the standards and

interpretations is monitored by the Accreditation Committee.  The Committee oversees

those schools that have received Council approval and also makes recommendations to

the Council regarding applications for ABA-approval and applications for acquiescence

in major program changes.

16.    The Council and the Committee are assisted by the Office of the Consultant

on Legal Education to the American Bar Association.  The Office of the Consultant

receives applications for approval or acquiescence, meets with representatives from the

5

applicant law schools, and provides the applicant with extensive information about the standards and interpretations and about the application process. The Office of the Consultant also coordinates a site evaluation to inspect law schools that submit applications.

17. Under the standards, interpretations, and rules, the Council may grant full or provisional approval to a law school. Sometimes approved law schools seek to change their programs or organizational structure. The Council must eventually acquiesce in any "major change" of a law school's educational program or organizational structure.

## CHANGES IN THE ABA INTERPRETATIONS

18. Before December of 2001, the ABA's interpretations governing an approved law school that wanted to operate its educational program at another location limited the school to either offering less than 20% of the school's program at the other location or starting a full, branch campus satisfying the requirements governing full law school programs. In December of 2001, the Council proposed new interpretations, numbered I-105-3 and I-105-4, that would also permit a school to:

> (a)    Establish a satellite campus offering the first year of its program ("first-year satellite"); or

> (b)    Establish a satellite campus offering more than the first year but less than two-thirds of its program ("two-year satellite").

The new interpretations allowed a school to start a satellite program without having to satisfy the more burdensome requirements of starting a full, branch campus. These changes were circulated for review to the Deans of all ABA-approved law schools,

and were the subject of hearings held by the Section's Standards Review Committee in February and May of 2002.

## COOLEY SEEKS ABA GUIDANCE BEFORE
## STARTING ITS OAKLAND SATELLITE PROGRAM

19.    Beginning in 2000, Cooley started seriously exploring the idea of opening another location in Michigan.  Ultimately, Cooley developed this idea into a plan to establish a satellite program at Oakland University in Rochester, Michigan.

20.    Cooley involved the ABA in this effort early-on by engaging in several discussions with the Office of the Consultant and its staff.  In particular, Cooley representatives initiated contact and held discussions with Barry Currier, then the ABA Deputy Consultant, to discuss the opening of a satellite program at Oakland University. Currier was authorized to provide schools with direction about how to proceed with applications for acquiescence in major changes in program or organizational structure and was also responsible for the site inspection process.

21.    On May 20, 2002, the Associate Dean of Faculty at Cooley, John Nussbaumer, e-mailed Currier and informed him that Cooley would be applying for a first-year satellite program at Oakland University.  Nussbaumer indicated to Currier that the ABA's interpretations then in effect were "pretty general" and he requested "some guidance on form and content" from Currier.

22.    On May 22, 2002, Nussbaumer telephoned Currier to discuss issues that might concern the Accreditation Committee in its review of an application for a first-year satellite program.  Currier informed Nussbaumer that, in general, the Committee would want to see a stable program over which the law school, and not the host school, has

7

control and, thus, would be concerned with Cooley's level of control over such things as the physical facilities at Oakland University and the law library.

23. During this same conversation, Currier told Nussbaumer that a site inspection would be necessary and acknowledged that having the program operational would be "a real advantage" to Cooley. Currier also told Nussbaumer that the Standards Review Committee had already met the previous week and had approved the proposed interpretations for first and second-year satellite programs as written and forwarded them to the Council for final approval.

24. Nussbaumer also discussed with Currier the difficulty of having two sets of requirements, the existing ones and the proposed satellite interpretations. Nussbaumer told Currier that Cooley was planning to prepare its application in accordance with the proposed satellite interpretations because they contained more detailed and explicit criteria. Nussbaumer specifically told Currier that Cooley was planning to organize its application around the proposed satellite interpretations, which set forth criteria for satellite campuses in five areas – full-time law school faculty; library resources and staff; student support services; access to the school's co-curricular activities and other educational benefits; and adequate physical facilities and technological capabilities. In response to Nussbaumer's description of Cooley's proposed application, Currier agreed that the proposed satellite interpretations were more focused and told Nussbaumer, "that's exactly how I would do it."

25. During this same conversation, Nussbaumer also told Currier that beginning in September 2002, Cooley intended to start operating another location at Oakland, as permitted under the then-existing requirements, by offering the first twelve credits of

Cooley's program there, and told Currier that Cooley planned to expand this into a satellite program by January 2003 so that the students who started in September 2002 could continue their studies at Oakland in January 2003.

26.     The proposed interpretations for satellite programs were tabled by the Council at its June 2002 meeting for further consideration at the Council's August or December 2002 meetings.  On June 21, 2002, Nussbaumer telephoned Currier to discuss the Council's failure to approve the proposed interpretations at the June meeting.  Currier told Nussbaumer that the proposals were tabled because the Council simply ran out of time at the June meeting.  He said that there was no hostility to the proposals and that the Council had not referred the proposals back to the Standards Review Committee for further consideration.   At no time during this conversation did Currier indicate that Cooley should change its plan of organizing its application around the proposed satellite interpretations.

27.     During this same conversation, Currier told Nussbaumer that the problem Cooley faced was not the substance of the satellite proposals, but the timing of trying to conduct a site inspection, have the report reviewed by the ABA's outside counsel for compliance with the Department of Justice antitrust consent decree, get the report to Cooley for its comments and corrections, and then get all of this to the Accreditation Committee in time for the Committee to consider it at the Committee's fall 2002 meeting. To ensure that there was sufficient time to get all of this done in time, Currier suggested scheduling a site visit before classes began in September 2002.  On June 23, 2002, Nussbaumer e-mailed Currier to indicate that Cooley would like to take him up on his offer of an earlier site visit and would be filing its application later that same week.

9

## COOLEY APPLIES FOR ACQUIESCENCE AND UNDERGOES THE FIRST SITE EVALUATION

28.    On June 25, 2002, Cooley filed an application for acquiescence in a two-year satellite program at Oakland University along with the $8,000 application fee. Cooley decided to apply for a two-year satellite in order to avoid the added expense and delay for all parties of filing and reviewing two separate applications, undergoing two separate site inspections, and working through the Committee and Council process twice. As part of this application, Cooley requested a one credit variance to allow it to offer 60 credits as part of its Oakland satellite, which would be exactly two-thirds of Cooley's 90-credit program.

29.    Based on Currier's advice, Cooley structured its application around the proposed interpretations for satellite programs. In the cover letter to the application from President and Dean Don LeDuc to the ABA Consultant, John Sebert, President LeDuc specifically advised Sebert that Cooley intended to start operating another location at Oakland beginning in the fall as permitted under the then-existing rules by offering its first-semester classes there, and specifically advised Sebert that Cooley intended to expand this into a two-year satellite program effective January 1, 2003. LeDuc also specifically noted Currier's suggestion that scheduling the site evaluation for the summer would make it possible to secure approval by January 2003, and proposed that this be done so that Cooley could continue the program at Oakland in January without interruption.

30.    Cooley's application was submitted on the official forms provided by the Consultant's Office with all of the information and documents requested by those forms included. Nothing on the forms and nothing in the discussions Cooley had with the

10

Consultant's Office indicated that any other information or documentation was required. The Consultant's Office accepted Cooley's application as written and cashed the check for the application fee. At no time did anyone from the Consultant's Office tell Cooley that it would be improper for it to start another location in September 2002 without first obtaining acquiescence from the ABA, that its application was in any way deficient, improper, or inappropriate, or that the proposed timing for approval by January 2003 was not feasible.

31.    On June 29, 2002 Nussbaumer e-mailed Currier to advise him that Cooley's application had been mailed and that Cooley had decided to apply for a two-year satellite program. Nussbaumer suggested the names of three possible site inspectors who were all familiar with Cooley from previous inspections or other contacts with the school.

32.    On July 11, 2002, Currier informed Cooley that he had independently selected and appointed a different site inspector, Professor Michael D. Floyd of the Samford University Cumberland School of Law, to serve as the site inspector for Cooley's proposed satellite program at Oakland University, assuring Cooley that Floyd was an experienced site evaluator. Upon receiving notification of the appointment, Cooley immediately contacted Professor Floyd, and then arranged and prepared for a site evaluation in just two weeks.

33.    The site evaluation occurred on July 25 and 26, 2002. The evaluation consisted of an inspection of both the main campus in Lansing, Michigan and the proposed satellite campus at Oakland University. The inspection included question and answer sessions conducted between the ABA's chosen site evaluator and numerous

11

personnel from both Cooley and Oakland University, including the Presidents of both institutions.

34. At all times, the evaluation was based on the ABA's proposed interpretations for satellite campuses. At no time before or after the site evaluation did the Consultant's Office object to Cooley's application, to the form of its submitted materials, or to its focus on the ABA's proposed interpretations for satellite campuses.

35. Following Professor Floyd's site evaluation, at the Council's August 2002 meeting, it once again did not act on the proposed interpretations for satellite campuses. And once again, no one from the Consultant's Office advised Cooley that its reliance on the proposed interpretations for satellite campuses was in any way inappropriate or improper.

36. With the full knowledge of the ABA, Cooley started classes at Oakland University in September of 2002, admitting and enrolling its first class of students. No one at the ABA raised any objection to the start of classes at this new location.

37. On September 12, 2002, Consultant John Sebert forwarded Professor Floyd's site inspection report (the "First ABA Report") to Cooley for comment. This report specifically cited and focused exclusively on the proposed interpretations for satellite programs, addressing curriculum, full-time faculty, library resources and staff, student support services, experiential learning opportunities, physical facilities, technological capabilities, and the effect on the existing J.D. program in Lansing. This report was very favorable to Cooley on all of these topics. Nothing in the report suggested that Cooley's application was incomplete or deficient in any way, or that

12

additional information would be needed from Cooley before the Committee could review and the Council could acquiesce in the Oakland satellite program.

38.    Before the First ABA Report was forwarded to Cooley for comment, it was reviewed by outside counsel for compliance with the antitrust consent decree previously entered into by the ABA and the United States Department of Justice in 1996, and also by the Consultant's Office for compliance with the Section's Rules of Procedure for Approval of Law Schools. The Consultant was required under Rules 2(d) and 2(e) to verify that the report contained sufficient facts and observations to enable the Committee and the Council to determine compliance with the applicable interpretations before the report was forwarded to Cooley for comment, and he never indicated to Cooley in his letter transmitting the report that it was inappropriate for Floyd to have used the proposed satellite interpretations, or that the report was otherwise deficient in any other way.

39.    The First ABA Report concluded that Cooley had carefully considered and planned the Oakland satellite campus, that the faculty and administrators at both institutions were dedicated to providing the resources necessary for the success of the program, and that the program should ultimately be self-supporting and create no adverse impact on the existing J.D. program in Lansing. The report did not raise any concerns about the five areas noted above and was in fact so favorable that Cooley accepted it as written without correction or comment as a complete, accurate, and fair evaluation of the Oakland satellite proposal.

40.    On September 15, 2002, Nussbaumer e-mailed Currier asking Currier to let Nussbaumer know if Currier had any thoughts or questions about Cooley's proposal before the Accreditation Committee meeting scheduled for October 31 through

13

November 2, 2002. Currier e-mailed Nussbaumer on September 23, 2002 and informed Nussbaumer that Cooley's application would be on the agenda for the Accreditation Committee's October 31 through November 2, 2002 meeting, and added that Professor Floyd has "good judgment/insights" about legal education. Currier did not identify any additional issues regarding Cooley's application, did not request any additional information from Cooley, and did not indicate that there were any gaps in or problems with Cooley's application as submitted.

### THE FIRST ACCREDITATION COMMITTEE MEETING

41.    At its October 31 through November 2, 2002 meeting, the Accreditation Committee considered Cooley's request for acquiescence, which included Cooley's application and the First ABA Report. The Chair of this Committee, John O'Brien, is the Dean of the New England School of Law, which shares hundreds of common applicants with Cooley annually, each of whom represents approximately $55,000 in tuition revenue. Dean O'Brien has voluntarily recused himself from Cooley-related matters in the past, but did not recuse himself from participating in this decision.

42.    Without any notice or explanation, the Committee did not apply the proposed interpretations for satellite programs that had formed the basis for all discussions and proceedings up to this point. Instead, the Committee referenced existing Interpretation 105-2, which deals with full, branch campuses that constitute "the creation of a different law school," and then selected and applied seven standards and one interpretation that govern the approval of full law school programs without any explanation why those particular standards and interpretations were selected, all contrary to the specific directions Cooley had been given by the Consultant's Office before filing

14

its application. Cooley had not applied for a branch campus and never had the
opportunity to address the standards and interpretation selected by the Committee
because Cooley justifiably relied on the express directions provided by the Consultant's
Office that had subsequently been confirmed by the Consultant's approval and
verification of the First ABA Report, which focused exclusively on the proposed
interpretations governing satellite programs.

43. In the Committee's November 6, 2002 action letter, it recommended that the
Council not acquiesce in Cooley's satellite program. It made no findings that Cooley's
program failed to satisfy the proposed satellite interpretations, and instead relied on the
standards and interpretations governing full law school programs that it had selected as
the basis for its decision. Those standards and interpretation focused on areas that had
been addressed favorably in the First ABA Report based on the proposed satellite
interpretations, but the Committee concluded that Cooley's plans were insufficient and
that Cooley's documentary submissions had not demonstrated that it would satisfy the
standards and interpretations governing full law school programs.

44. Specifically, the Committee concluded that Cooley's documentary
submissions had not demonstrated that it would have a library collection, library staff,
staffing for student services, and resident, full-time faculty sufficient to meet the
standards and interpretations governing full law school programs that the Committee had
selected, and that firm, specific agreements for physical space had not yet been
"determined." To the best of Cooley's knowledge, the only evidence in the record before
the Committee was Cooley's application and the First ABA Report. The Committee did

not indicate what actions by Cooley would be sufficient to address its concerns under the standards and interpretation it selected.

45. This action by the Accreditation Committee was particularly surprising because the Consultant's Office had indicated to Cooley that the Committee had already recommended and the Council had already acquiesced in the opening of a first-year satellite program at Stetson University College of Law. Elizabeth Moody was a member of the Council at the time that Stetson secured acquiescence in this program. She was the former Dean of Stetson, and was Dean Emeritus and a Professor at Stetson at the time the Council granted acquiescence.

46. The level of detail that the Committee was now asking to see was also surprising given the pre-implementation status of Cooley's satellite application, the difficulty of providing greater specificity at this pre-implementation stage, and the fact that Cooley had submitted its application on the forms provided by the Consultant's Office, answered every question on those forms, and provided all of the information and documentation requested.

47. On November 13, 2002, President LeDuc and Associate Dean Nussbaumer participated in a conference call with Consultant John Sebert and Deputy Consultant Barry Currier about Cooley's right to appear before the Council at the Council's December 6-7, 2002 meeting to appeal the Committee's recommendation. During this call, Sebert and Currier indicated that there was Committee "common law" that had been developed in the Stetson case, but that this "common law" was not written down anywhere and could not be shared with Cooley because all matters involving other schools were confidential. They also indicated that Cooley could submit additional

16

material for the Council's consideration pursuant to the new evidence requirements in Rule 6(e).

48.    On November 20, 2003, Cooley submitted a detailed and voluminous written response objecting to the Committee's use of the standards and interpretation governing full law school programs that the Committee had selected and addressing in detail the Accreditation Committee's claimed concerns, well in advance of the December Council meeting at which Cooley's appeal from the Accreditation Committee's recommendation would be considered.  The materials were submitted to the Council, instead of the Accreditation Committee, because the Accreditation Committee would not meet again before the start of winter classes for the Oakland program.  As Cooley had previously advised the Consultant in June when it submitted its application, it wanted to obtain acquiescence so those Oakland students would not have to switch to the Lansing campus in January of 2003.

49.    On December 3, 2002, Nussbaumer met with Sebert and Currier at the ABA Consultant's Office in Chicago, Illinois to discuss Cooley's planned December 6, 2002 appearance before the Council.  Nussbaumer specifically asked Sebert how Cooley's application, as supplemented by Cooley's November 20, 2002 submission, compared to Stetson's.  Sebert stated that as far as Cooley's first-year satellite program was concerned, Cooley had "done as good a job as Stetson, maybe even a little better" and that Cooley "matched up very favorably with Stetson."  Sebert also indicated that he felt that Cooley had done a "good job" of responding to the Accreditation Committee's concerns, at least regarding the first year.  Neither Sebert nor Currier mentioned any

17

differences between the nature of Cooley's proposed program and Stetson's program during this meeting.

### THE FIRST COUNCIL MEETING

50. On December 6, 2002, President LeDuc and Associate Dean Nussbaumer made Cooley's presentation to the Council regarding acquiescence in the two-year satellite program at Oakland University. Cooley not only asked the Council to grant Cooley acquiescence, but it also presented the Council with its response to the Committee's November 6, 2002 action letter.

51. Later that same day, after Cooley's presentation, Sebert told LeDuc and Nussbaumer that he thought they had made a good presentation to the Council, but that the Council had decided to remand the entire matter to the Accreditation Committee for consideration of the additional material that Cooley had submitted. The next day, the Council denied a request by Cooley to at least consider granting acquiescence in a one-year satellite program and also denied a request by Cooley for a temporary variance, which the Council was authorized to grant, to permit the Oakland students to continue their studies at the Oakland campus until January 24, 2003 when the Accreditation Committee was next scheduled to meet.

52. On December 9, 2002, President LeDuc formally requested in writing that the Consultant's Office provide Cooley with a copy of Stetson's application for acquiescence, arguing that fundamental fairness required that a school have access to the "common law" that was being applied to decide its application for acquiescence, particularly in light of the substantial investment of time and money that Cooley had made in the Oakland program. This request was denied.

18

53.    Also on December 9, 2002, Cooley filed its application for acquiescence in an almost identical program in Grand Rapids, Michigan in association with Western Michigan University, along with a check for the $8,000 application fee. The Consultant's Office accepted this application and cashed the check for the fee. Before filing this application, Associate Dean Nussbaumer telephoned Deputy Consultant Currier and asked him whether any other schools had applications for satellite or branch campuses pending before the Accreditation Committee or the Council, and Currier answered in the negative.

54.    At the same December 6-7, 2002 meeting of the Council at which the Council refused to grant acquiescence, the Council formally approved the proposed interpretations governing satellite programs that had first been distributed for comment in December of 2001. These interpretations were approved without any significant changes from the original draft of those proposals. But in its action letter of December 10, 2002 remanding Cooley's application to the Accreditation Committee, the Council reiterated and affirmed the Accreditation Committee's reliance on Interpretation 105-2 and the standards and interpretation applicable to full law school programs that the Committee had selected and relied on in refusing to recommend acquiescence in the Oakland satellite program. The Council did not make any findings that Cooley's program failed to satisfy the approved satellite interpretations.

55.    The Council's December 10, 2002 action letter remanding Cooley's Oakland application to the Committee specifically directed the Committee to consider on remand "whatever portion of the application the School desires." President LeDuc wrote to the Consultant in a letter dated December 13, 2003 and advised him, pursuant to the

19

Council's remand order, that Cooley wished to have the Committee consider Cooley's two-year application as submitted, and if the Committee decided to recommend against the two-year application, to consider recommending acquiescence in a one-year satellite program.

## THE REMAND TO THE ACCREDITATION COMMITTEE

56. Following the Council's remand decision, in response to the conclusions of the Committee that Cooley's plans were insufficient and that Cooley's documentary submissions had not demonstrated compliance with the standards and interpretations governing full law school programs, Cooley made financial and other commitments to purchase two complete law school library collections, one for Oakland and one for Grand Rapids; to hire full-time library staff at both locations; to hire additional full-time administrators and staff to provide student services at both locations; and to hire full-time resident faculty for both locations. In addition, in response to the Committee's and Council's demand that Cooley had not secured "firm, specific agreements for physical space," Cooley entered into binding contractual agreements with Oakland University and later with Western Michigan University for physical facilities to house its programs. Cooley submitted information about the Oakland contractual agreement to the Committee in writing on December 17, 2002 and during its presentation before the Committee on January 24, 2003.

57. Before the Accreditation Committee hearing on January 24, 2003, Cooley received a letter from Sebert dated January 8, 2003 stating that the Committee would only consider a one-year satellite, not the two-year satellite presented in Cooley's application. This was directly contrary to the Council's remand order.

20

58.    The January 8, 2003 letter from Sebert also indicated that the Committee wanted to conduct additional on-site "fact finding" before reviewing the two-year satellite request. This letter implied that there would be a program to inspect when the fact-finders arrived, but did not indicate what additional facts the new "fact finding" would uncover that were not obtained in the original site visit and the additional written materials submitted by Cooley.

## THE SECOND ACCREDITATION COMMITTEE MEETING

59.    At the Accreditation Committee meeting on January 24, 2003, again chaired by Dean John O'Brien of the New England School of Law, each Committee member was provided with a "fact sheet" about Cooley prepared by the Consultant's Office. This fact sheet was not part of the record, had never been shared with Cooley before the meeting, and was not provided to Cooley until several days after the meeting. Even worse, many of the key facts were false. The fact sheet stated that Cooley's annual expenditures exceeded total revenue by approximately $4,000,000, when in fact Cooley has operated at a surplus in every year since it became accredited. The fact sheet said that Cooley had only 45 full-time faculty members, when in fact it had 63. And the fact sheet said that Cooley only employed four full-time librarians when in fact it employed twelve.

60.    These issues were among the material areas of concern raised by Committee members at the meeting. Although Associate Dean Nussbaumer corrected one erroneous statement by one Committee member during the meeting about Cooley's student-faculty ratio, the falsity of the other facts relating to the total number of full-time faculty, Cooley's financial condition, and the size of its library staff did not come up during the meeting. It was only after the meeting ended that the Consultant's Office provided

21

Cooley with a copy of the original fact sheet, acknowledged that it was incorrect, and provided Cooley with a corrected fact sheet that corrected the false assertions in the original fact sheet regarding the number of full-time faculty and library staff.

61. To the best of Cooley's knowledge, information, and belief, this corrected fact sheet was not before the Committee when it made its decision to once again recommend that acquiescence not be granted. In the Committee's most recent action letters, dated July 14, 2004, it finally acknowledged that with regard to Cooley's financial condition, the school has never run an operating deficit.

62. Despite a voluminous amount of detailed information concerning Cooley's proposed satellite program at Oakland University and adequate documentary responses that addressed the Committee's and the Council's perceived concerns about the program, the Accreditation Committee issued an action letter on February 3, 2003 recommending against acquiescence. The action letter continued to base its recommendation against acquiescence on Cooley's failure to comply with the standards and interpretation governing full law school programs that the Committee had selected, including full-time faculty and library staffing, instead of the satellite campus interpretations that Cooley had been directed to follow in submitting its applications, which by this time had been approved by the Council at its December 2002 meeting. The Committee again made no findings that Cooley had failed to satisfy the substantive requirements in the satellite interpretations. And the Committee's letter once again failed to specify what actions Cooley would have to take to meet the perceived deficiencies in its application.

63. The first reason identified by the Committee in the conclusions section of its February 3, 2003 action letter as to why it could not recommend acquiescence was that

22

Cooley had not demonstrated compliance with Standard 501 relating to admissions standards. Cooley was on Rule 11(a) reporting status regarding this issue arising from a 1998 inspection of Cooley's Lansing campus. Although the Consultant's Office and the Committee were fully aware of this issue from the day that Cooley first filed its Oakland satellite campus application on June 25, 2002, the issue had never before come up in the previous eight months of discussions and correspondence between the parties regarding the Oakland campus, consistent with repeated promises previously made by Consultant John Sebert that this issue would not stand in the way of any new programs that Cooley might submit for consideration, and had not been cited by the Committee as a ground for recommending that acquiescence not be granted in the Committee's first action letter. This issue was in fact irrelevant to Cooley's Oakland satellite application because Cooley had adopted a formal policy raising its admissions standards at Oakland, as Sebert himself had recognized in conversations with Cooley in which he encouraged Cooley to bring this fact to the attention of the Council as a positive point about the Oakland program.

64. The Committee's February 3, 2003 action letter did not indicate that the Standard 501 issue involving admissions standards at the Lansing campus would preclude consideration of the merits of Cooley's Oakland satellite campus application until this issue was resolved, and the Committee went on to act on the merits of Cooley's satellite application, concluding that Cooley's documentary submissions failed to establish that student services, library personnel and services, and full-time faculty would be sufficient to satisfy the standards and interpretations governing full law school programs, and that Cooley still had not established that it had secured adequate facilities

23

for the program, despite written assurances from the President of Oakland University that adequate facilities would be provided. In addition, the Committee included yet another new issue relating to co-curricular and extra-curricular activities that had never been raised in any of the Committee's previous conclusions. This issue had in fact been specifically and thoroughly addressed in previous documentary material submitted to the Committee and the Council. The Committee concluded by indicating that additional fact-finding (i.e. another site inspection) would be required before it would consider Cooley's two-year satellite campus application.

65. Other than the approved satellite interpretations, the only other rule that could have applied to Cooley's satellite program was Rule 18(p), which provides that the Council shall acquiesce in a proposed major change if that change will not detract from the law school's ability to maintain a sound educational program leading to the J.D. program. The First ABA Report expressly found that the planned implementation of the Oakland program "should prevent any significant adverse impact on the Lansing J.D. program."

### THE SECOND COUNCIL MEETING

66. On February 4, 2003, within 24 hours of receipt by Cooley of the Accreditation Committee's February 3, 2003 action letter, Cooley provided the Council with a written, point-by-point response to the Committee's conclusions and recommendation, pointing out among many other errors the fact that the Committee had been provided with the erroneous, *ex parte*, and materially misleading fact sheet and that the Committee had added new concerns that had never been raised before in any of the previous proceedings.

67. On February 8, 2003, President LeDuc, Associate Dean Nussbaumer, and former ABA President Wallace Riley, who has represented Cooley in other matters involving the Committee and the Council, appeared before the Council to urge the Council to grant acquiescence. Contrary to its own remand order to the Committee, the Council refused to consider Cooley's two-year satellite application as submitted, and instead only considered whether to grant acquiescence in a one-year satellite program. Cooley's representatives were informed of this decision just minutes before they entered the room to address the Council.

68. Two days later, on February 10, 2003, the ABA House of Delegates concurred in the Council's December 2002 approval of the interpretations governing satellite programs that Cooley had been directed to follow eight months earlier.

69. On February 11, 2003, the Council issued an action letter adopting the Accreditation Committee's recommendation against acquiescence in a one-year satellite program at Oakland University. The Council continued to base its decision on the prior standards and interpretation governing full law school programs that had previously been selected instead of the interpretations governing satellite campuses that the House of Delegates had concurred in the previous day. The Council gave no explanation why it did not consider Cooley's request for acquiescence under the approved satellite interpretations, which it could have done conditioned on the expected concurrence by the House of Delegates, even though it had already granted acquiescence for a similar program at Stetson. Nor did it make any findings that Cooley's program failed to comply with the approved satellite interpretations.

25

70.    The Council's February 11, 2003 action letter added yet another new reason for why acquiescence could not be granted that had not been raised in any of the previous action letters – that Cooley had failed to establish that the Oakland program would not detract from Cooley's overall ability to maintain a sound educational program leading to the J.D. degree, apparently referring to the potential impact of the Oakland program on Cooley's main campus in Lansing.  This conclusion was directly contrary to the factual findings in the First ABA Report, which concluded that the Oakland program "should ultimately be self-supporting and create no adverse impact on the existing J.D. program in Lansing" and that "[e]ven if the OU satellite does not develop according to projections, the phased implementation of that program should assure that any adverse impact on the Lansing programs would be, at worst, minimal."

## NOTICE TO THE CONSULTANT OF COOLEY'S INTENTION TO PROCEED

71.    By letter dated February 8, 2003, President LeDuc advised Consultant John Sebert that while Cooley had up to this point voluntarily refrained from implementing the major program change proposed in its application, it believed that Rule 19(d) of the Section's Rules of Procedure for Approval of  Law Schools authorized a school to implement such a program upon proper notice to the Consultant, to be followed by a subsequent site inspection of the program within six months to determine compliance with the applicable  requirements.  This letter explained in detail the basis for Cooley's interpretation of Rule 19(d) and why Cooley believed that it was the only logical interpretation of the rules, and advised the Consultant that Cooley would open its program at Oakland University effective February 8, 2003 as described in the application already in the Consultant's possession.

26

72. On February 11, 2003, President LeDuc also sent the Consultant formal notice of Cooley's intent to submit an application for provisional approval of a branch campus at Oakland University in August of 2003, by which time the letter stated that the Oakland program "will complete one academic year of operation."

73. Cooley sent almost identical letters to the Consultant on February 8, 2003 and February 11, 2003 regarding its Grand Rapids program, with a start date there of May 2003.

74. Following President LeDuc's February 8 and 11, 2003 letters, Cooley proceeded to implement its Oakland and Grand Rapids programs consistent with the notice provided to the Consultant in those letters. Despite this notice, neither the Accreditation Committee nor the Council took any action to stop the development of these programs. By letter dated March 4, 2003, Cooley specifically requested an official interpretation of Rule 19(d) from the person or body with the authority to issue such an interpretation. While the Consultant and the Chair of the Council wrote letters expressing their personal opinions that Cooley's interpretation of Rule 19(d) was incorrect, the Chair of the Council also wrote that only the Council could issue an official interpretation, and the Council did not indicate to Cooley in any way that Cooley's interpretation was incorrect until December 17, 2003.

## THE SECOND SITE INSPECTION

75. On July 27-30, 2003, the ABA completed a second site evaluation of the Oakland program and a site evaluation of the Grand Rapids program. For these site evaluations, the ABA selected three evaluators, including Michael D. Floyd, who performed the first site evaluation at Oakland, Edwin J. Butterfoss, the former Dean of

the Hamline University School of Law and the current Vice-Chairman of the
Accreditation Committee, and Laura Gasaway, the Associate Dean for Library and
Information Services at the University of North Carolina School of Law and a former
member of both the Accreditation Committee and the Council. Both site evaluation
reports (collectively, the "Second ABA Report") were forwarded to Cooley on
October 13, 2003 and, consistent with the First ABA Report, were again very favorable.
The Second ABA Report thoroughly reviewed the curriculum, student orientation and
advising, academic support services, career services and other student support services,
co-curricular activities, faculty, students, administration, library collection, library staff,
information services, finances, and facilities at the satellite sites, found no current
deficiencies in any of these areas, and concluded that both programs were "very well"
planned, "very well" implemented, and seemed "extremely well administered."

## THE CONSULTANT'S REACTION TO COOLEY'S OPERATION OF THE OAKLAND AND GRAND RAPIDS PROGRAMS

76.    Despite the February 8 and 11, 2003 letters that Cooley had sent to the
Consultant notifying him of Cooley's intent to implement both of these programs, and
despite having sent a second site evaluation team to inspect both programs to confirm that
Cooley had followed through on its commitments, the Consultant sent Cooley an
August 9, 2003 letter expressing surprise at the continued operation of the Oakland and
Grand Rapids programs.

77.    After being reminded that Cooley had sent him letters in February notifying
him of the operation of these two programs under Rule 19(d), the Consultant brought this
matter to the attention of the Accreditation Committee at a Committee retreat held on
October 3-4, 2003 and asked the Committee to make a determination whether Cooley's

operation of these programs violated the procedural rules for major changes. Cooley was not informed that this matter would be considered by the Committee at its October 3-4, 2003 retreat and was not invited to appear before the Committee.

78. At the retreat, the Committee determined that it had reason to believe that Cooley was not in compliance with the procedural rules governing major changes because it was operating its satellite campuses without prior acquiescence. During the Committee's consideration of this matter, the Consultant specifically represented to the Committee that Rule 19(d), which was the basis for Cooley's position that it was authorized to proceed, had been "deleted" from the Section's Rules for Approval of Law Schools. That representation by the Consultant was untrue, as he subsequently acknowledged to Cooley after the Committee made this determination.

## THE BRANCH CAMPUS APPLICATIONS

79. On October 12, 2003, Cooley submitted branch campus applications seeking acquiescence and provisional approval to operate a branch campus at Oakland University beginning in September 2004 and a branch campus at Grand Rapids beginning in May of 2005, accompanied by the $8,000 application fee for each location. The Consultant's Office accepted these applications and cashed the checks for the application fees. President LeDuc's cover letter asked for a site inspection for both locations by January 15, 2004 as required by the ABA's own rules.

## THE THIRD ACCREDITATION COMMITTEE MEETING

80. On November 7, 2003, President LeDuc, Associate Dean Nussbaumer, Associate Dean Lynn Branham (the new dean hired by Cooley to be in charge of the Grand Rapids program), and Associate Dean and General Counsel James Robb, appeared

29

before the Accreditation Committee. This meeting was again chaired by Dean John
O'Brien of the New England School of Law.

81. Prior to this meeting, on September 15, 2003, Cooley had submitted a
written report to the Committee on the success of its Academic Profile and Bar Results
Improvement Plan focusing on the improving academic profiles of the students being
admitted to Cooley since September 2002 when the profile-improvement part of this plan
was first implemented. At the November 7, 2003 Accreditation Committee meeting,
among the other issues considered by the Committee were Cooley's bar examination
results and Cooley's remediation plan for addressing and improving those results.

82. Following this meeting, on November 13, 2003, the Accreditation
Committee issued an action letter concluding that Cooley had demonstrated compliance
with Standard 501 relating to admissions standards, thereby completely eliminating this
basis for denial of acquiescence stated in the Committee's action letter of February 3,
2003, concluded Cooley's Rule 11(a) reporting status, and ended Cooley's 1998
sabbatical inspection with the conclusion that Cooley should remain on the list of
approved schools.

83. In a separate action letter dated November 19, 2003, the Accreditation
Committee once again recommended that the Council not grant acquiescence in Cooley's
satellite programs. This time the only reason mentioned by the Committee for its
recommendation against acquiescence was that Cooley had not complied with the
procedural requirements for major changes by failing to obtain prior acquiescence before
implementing the satellite programs. Rule 3(d) requires the action letter to include the
"specific reasons" for denying acquiescence. The Committee's action letter did not

30

identify any substantive concerns regarding compliance of the programs with the now approved interpretations governing satellite programs.

84. The Committee's November 19, 2003 action letter also directed President LeDuc to appear before the Committee at its January 23, 2004 meeting pursuant to Rule 11(b) to "show cause why the School should not be required to take appropriate remedial action, placed on probation, or removed from the list of law schools approved by the American Bar Association."

## THE THIRD COUNCIL MEETING

85. On December 1, 2003, Cooley filed a detailed response to the Accreditation Committee's action letter, and on December 5, 2003 President LeDuc, Associate Dean Nussbaumer, Associate Dean Branham, and Associate Dean Robb appeared before the Council. Without addressing the merits of Cooley's response, the Council issued an action letter on December 17, 2003 concluding that it could not grant acquiescence for either satellite campus because each campus was being operated without having obtained prior acquiescence. It also directed Cooley to appear before the Accreditation Committee at the show cause hearing scheduled for January 23, 2004 and reiterated that the possible sanctions available would include removal from the list of law schools approved by the American Bar Association. The Council again made no findings that Cooley's satellite programs failed to satisfy any of the substantive requirements governing satellite campuses.

## THE SUBSEQUENT MOTIONS

86. On December 17, 2003, Cooley filed a motion to disqualify Dean O'Brien from all further participation in these matters and a motion to reconsider the

31

Accreditation Committee's November 19, 2003 decision, which under the Section's rules is to be decided by Dean O'Brien as the Chair of the Accreditation Committee. On December 30, 2003, the Consultant responded on behalf of Dean O'Brien and advised Cooley that its motion for reconsideration was not appropriate under the Section's rules.

87.    On January 8, 2004, the Consultant wrote to advise Cooley that the Council would not acquiesce in the operation of a satellite campus if the requesting school was already operating a satellite campus without having obtained prior acquiescence, and that his office would take no further action on Cooley's branch campus applications before the re-scheduled show cause proceeding, then set for April 23, 2004, unless Cooley shut down both satellite programs beyond 15 credits of classes (approximately the first semester). At the time, the Oakland program was offering 54 credits of classes and the Grand Rapids program was offering 36 credits.

88.    Cooley repeatedly offered the ABA proposed settlements to equitably resolve this matter and repeatedly attempted to discuss these proposals with ABA representatives, all without success. In one communication, the ABA "declined to consider" Cooley's proposals. Numerous requests by Cooley representatives, including Mr. Wallace Riley, former President of the ABA, to meet with representatives of the ABA to discuss this matter have not even been acknowledged.

89.    By letter dated January 27, 2004, the Consultant informed Cooley that Cooley's motion to disqualify Dean O'Brien from all further proceedings in this matter had been denied because there was "no basis" for Dean O'Brien to be recused.

90.    By letter dated March 9, 2004, the ABA confirmed that its December 17, 2003 action letter denied acquiescence to offer satellite programs at both locations. The

32

March 9, 2004 letter also confirmed that Cooley could face the loss of accreditation for its entire program at the April 23, 2004 show cause proceeding. The ABA refused to respond to Cooley's request for the procedural rules that governed the show cause proceeding.

## COMMENCEMENT OF THIS ACTION

91. On March 30, 2004, Cooley filed this lawsuit. Shortly afterwards, Cooley filed a motion for a preliminary injunction. In that motion, Cooley sought to enjoin the ABA from imposing sanctions against Cooley, and to require the ABA to conduct site inspections of the satellite campuses at Oakland and Grand Rapids in furtherance of Cooley's applications for acquiescence in its branch campuses there. This Court heard the motion on April 16, 2004.

92. During the April 16, 2004 hearing, Cooley and the ABA entered into an agreement in which Cooley agreed to reduce its programs at Oakland and Grand Rapids so that no student could earn more than 15 credit hours toward the J.D. degree at either or both locations and further agreed not to reopen the satellite programs to permit students to earn more than 15 credits without prior acquiescence of the ABA's Council of the Section of Legal Education and Admission to the Bar. In return, the ABA agreed, among other things, that the Accreditation Committee would "consider and make a recommendation on the merits" of Cooley's applications for acquiescence in the two-year satellite programs at Oakland and Grand Rapids at its June 25-26, 2004 meeting and that the Council would "consider on the merits" the Accreditation Committee's recommendations at its August 5-6, 2004 meeting. The ABA also agreed to defer the April 23, 2004 show cause proceeding until the June 25-25, 2004 Accreditation

33

Committee meeting. This Agreement was confirmed in a Stipulation and Agreed Order filed with the Court.

## COOLEY REDUCES ITS SATELLITE PROGRAMS IN CONFORMITY WITH THE AGREEMENT REACHED AT THE HEARING

93.  Immediately following the April 16, 2004 hearing, Cooley fulfilled its obligations under the Stipulation and Agreed Order by moving 27 sections of Oakland and Grand Rapids classes beyond the first 15 credits back to its Lansing campus on less than two weeks' notice, notifying all students who remained enrolled for a class at Oakland or Grand Rapids that effective immediately they could take no more than 15 credits total at either or both locations, and individually auditing each student who remained enrolled in any Oakland or Grand Rapids classes to make sure that no student would exceed the 15 credit limit. Cooley then certified to the ABA that it had taken these actions, that every student taking a class at Oakland or Grand Rapids was in compliance with the 15-credit limit, and that Cooley would take comparable steps in future semesters to ensure continuing compliance until the Council grants acquiescence. The ABA's Accreditation Committee confirmed Cooley's compliance with these requirements in Finding (16) of its July 7, 2004 Action Letter: "Pursuant to the 'Stipulation and Agreed Order' entered in Cooley's lawsuit against the American Bar Association, effective with the start of the May 2004 term, Cooley has limited the operation of its Oakland and Grand Rapids campuses so that no student may earn more than 15 credits towards the J.D. degree at either campus."

94.  In limiting the students enrolled in classes offered at Oakland and Grand Rapids to earning no more than 15 credit hours total at either or both of these locations, Cooley became fully compliant with ABA Standard 105.

## THE FOURTH ACCREDITATION COMMITTEE MEETING

95.  The Accreditation Committee scheduled the show cause proceeding against Cooley for 9:00 a.m. on June 25, 2004. It scheduled a separate proceeding on Cooley's applications for acquiescence in the satellite programs for later that afternoon. Cooley requested that the proceedings be conducted in reverse order so that the Committee could have the benefit of its review of the merits of the satellite programs before the show cause proceeding, but this request was denied. The Committee followed the same sequence with its action letter relating to the show cause proceeding dated July 7, 2004, and its action letters relating to the applications for acquiescence dated July 14, 2004, all of which were received by Cooley on July 15, 2004.

96.  On June 1, 2004, more than three weeks ahead of the scheduled June 25, 2004 proceedings, Cooley submitted a motion for a ruling that ABA Rule of Procedure 13 barred the imposition of any sanctions against Cooley given that Cooley was now fully in compliance with Standard 105. In addition, Cooley submitted a motion in limine to exclude information relating to action taken in 1997 involving Cooley's weekend scheduling option, and also submitted a lengthy statement in mitigation of sanctions, a list of questions to be answered by the Committee Chair, proposed findings of fact and conclusions of law, and detailed responses to sixteen questions the Consultant had previously submitted to Cooley, with voluminous attachments. Cooley also moved to have two of those sixteen questions dealing with academic attrition and bar results at the

35

Lansing campus ruled irrelevant on various grounds, including that those issues had been resolved by the Committee in Cooley's favor when the Committee concluded Cooley's 1998 sabbatical inspection in its action letter of November 13, 2003. Cooley further asked that the ABA send Cooley a copy of all information sent to the Committee for its consideration at the June 25, 2004 proceedings.

97.   Prior to Cooley's June 25, 2004 appearance at the show cause proceeding, it was informed that a request that it had made to cross-examine witnesses at the proceeding had been denied. During the proceeding, the Committee's lead questioner, Committee Vice-Chair Ed Butterfoss, asked Cooley's representatives more than 50 questions, many of them in cross-examination style format, including questions about the pending litigation that sought admissions against interest, after previously telling Cooley representatives earlier in the week that he would not have many questions. Another Committee member also asked questions about the pending litigation that sought admissions against interest. That same Committee member independently investigated Cooley's Georgia bar results and presented information about those results to the Committee during the proceedings, without prior notice to Cooley. In addition, among the matters Cooley's representatives were questioned about was a package of documents, selected by the Committee from the voluminous record in this matter, that was handed to Cooley's representatives for the first time a few seconds before they entered the room to appear before the Committee, and that was missing critical documents that supported Cooley's position.

98.   In addition, unknown to Cooley, the Committee also had before it secret, *ex parte*, extra-record evidence in the form of two letters from the Dean of Michigan State

36

University College of Law, copies of which were not provided to Cooley until the Committee issued its July 7, 2004 action letter announcing its recommended sanctions. These letters complained about Cooley's operation of its satellite campus in Grand Rapids and made factual assertions and accusations about various matters. Cooley never had an opportunity to address or rebut the complaints, assertions, and accusations made in these letters before the Committee made its recommendations, and the Committee did not explain the relevance of these letters to the issues raised by the show cause proceeding.

99. During the show cause proceeding, Cooley reiterated that it was now fully in compliance with the 15-credit limit imposed by Standard 105 and argued that under Rule 13, the Committee was required to find that Cooley was in compliance with Standard 105 and to issue a resolution to that effect ending the show cause proceeding. Cooley also asked for rulings on the motions that it had filed. The Committee did not rule on any of the motions that Cooley had filed, either during the proceedings or afterwards in its action letter.

100. In the Committee's July 7, 2004 action letter regarding the show cause proceeding, the Committee made the specific factual finding that "Cooley has limited the operation of its Oakland and Grand Rapids campuses so that no student may earn more than 15 credits toward the J.D. degree at either campus." But contrary to the express requirements of Rule 13, the Committee never concluded that Cooley was currently in compliance with Standard 105 at the time of the show cause proceeding, and recommended the imposition of sanctions contrary to the plain language of Rule 13.

37

101. The Committee also failed to rule on Cooley's motion in limine regarding its weekend scheduling option, and specifically mentioned the previous action taken against Cooley in that matter in the findings in its July 7, 2004 action letter.

102. The Committee also failed to address Cooley's lengthy statement in mitigation, which among other things asked the Committee to consider the extent to which the actions of the Consultant's Office, the Committee, and the Council had contributed to the dispute in this matter.

103. The Committee's finding that Cooley has limited its Oakland and Grand Rapids programs so that no student may earn more than 15 credits towards a J.D. degree conclusively established that Cooley had brought itself into compliance with Standard 105 before the show cause proceeding. Despite this finding, and the plain language of Rule 13 requiring a finding of present non-compliance with the standards before any sanction may be imposed, the Committee recommended:   (1) that the Council publicly censure Cooley for substantial and persistent noncompliance with Standard 105 by operating satellite campuses at Oakland and Grand Rapids without prior acquiescence; (2) that the Council direct Cooley to publish a statement summarizing the Council's censure prominently on Cooley's website and in its marketing and admissions materials and publications and to distribute this statement to all current and prospective students and faculty for a period of two years; and (3) that Cooley be ineligible to operate any satellite or branch campus prior to September 2005. The Committee failed to offer any rationale explaining the selection of these particular sanctions or why these sanctions were appropriate under the circumstances, and failed to explain why in its judgment Cooley's past non-compliance had been persistent and substantial given the arguments in

Cooley's statement in mitigation that it had at most operated satellite campuses offering more than 15 credits for one semester after finally receiving an official interpretation from the Council that prior acquiescence was required in the Council's December 17, 2003 action letter.

104. As to Cooley's applications for acquiescence, the Accreditation Committee made extensive factual findings about the curriculum, student services, faculty, students, administration, library and information resources, finances, and facilities at both Oakland and Grand Rapids that were overwhelmingly favorable, consistent with the July 2002 and July 2003 site inspection reports filed by the site teams appointed by the ABA to report on Cooley's satellite applications. But despite these favorable factual findings, the Committee did not apply Interpretations 105-3 and 105-4, which set forth the substantive requirements for satellite campuses, to these findings, and did not make any determination or recommendation on the merits whether the Oakland and Grand Rapids programs satisfied these requirements. Rule 11(a) requires that if the Committee has reason to believe that a law school does not comply with the standards, the Committee "shall inform the school of its apparent non-compliance." The Committee did not identify any areas of non-compliance under Interpretations 105-3 and 105-4.

105. Instead, the Committee for the first time in the two years that Cooley's satellite applications have been pending raised an entirely new issue to block acquiescence in the Oakland and Grand Rapids satellite programs – the performance of Cooley's Lansing graduates on the July 2003 and February 2004 bar examinations. In doing so the Committee made no attempt to explain how these bar results and the satellite programs could possibly have any connection. The Committee relied on Standard 301

39

and Interpretation 301-1 as the grounds for recommending to the Council that acquiescence not be granted, but without concluding that Cooley was in violation of those provisions. Those provisions had never been mentioned in any of the Committee's previous action letters regarding Cooley's satellite campus applications.

### THE FOURTH COUNCIL MEETING

106. Cooley received the Committee's July 7, 2004 and July 14, 2004 action letters on July 15, 2004. On July 22, 2004, Cooley filed a submission to the Council challenging the Committee's actions recommending the imposition of sanctions and recommending against acquiescence in Cooley's satellite campus applications.

107. With regard to the issue of sanctions, Cooley's July 22, 2004, submission argued that Rule 13 does not permit the Committee to impose a sanction on a school that is currently in compliance with the standards at the time of the show cause proceeding; that the Committee's action was invalid because it failed to rule on Cooley's motions and failed to consider the statement in mitigation and other materials that Cooley had submitted; that the Committee's conduct of the show cause proceeding included procedural and due process violations that required reversal of the Committee's action; that the Committee's findings, conclusions, and recommendations were not supported by the record; that the Committee's recommendation of sanctions was ultra vires, not supported by the facts, not justified by the single conclusion adopted, and not supported by any reasoning whatsoever; and that the Committee's failure to consider the merits of the programs offered at the satellite campuses in determining the appropriate sanction was an abuse of discretion.

108.  With regard to the issue of acquiescence, Cooley's July 22, 2004 submission argued that the ABA failed to identify by definition or example what is an acceptable bar passage rate; departed from its own past practices by focusing on isolated sets of results; failed to follow its own procedures by failing to include comparable results from other schools; failed to consider comparable results from other schools showing that the performance of Cooley's graduates on the bar examination is equal to or better than a substantial number of approved schools; relied on Cooley's overall, out-of-state bar results without any comprehensive data from other schools that would make an objective comparative analysis possible; ignored its own conclusion in November 2003 that Cooley's long-term remediation plan was sufficient to demonstrate compliance with all standards and interpretations; ignored its own implicit, but required finding, made in connection with Cooley's Oakland LL.M. programs, that Cooley's existing J.D. program exceeded the standards; ignored important factual differences between the Oakland and Grand Rapids satellite programs and the Lansing program relating to admission standards; ignored important factual differences between the current Cooley curriculum and that taken by the students who sat for the July 2003 and February 2004 bar examinations; ignored the substantial academic support programs that Cooley has implemented to help its current Lansing students prepare for the bar examination; ignored the substantially improved bar passage rates achieved by the students who choose to participate in these academic support programs; continued to prohibit Cooley from requiring these programs as a condition of graduation; did not attempt to establish a connection between the opening of the Oakland and Grand Rapids satellite programs and the performance of Cooley's Lansing graduates on the July 2003 and February 2004 bar

examinations; did not attempt to establish that the Oakland and Grand Rapids programs would otherwise detract from Cooley's ability to maintain a sound educational program; ignored the findings in the First ABA Report that Cooley's satellite program should have no adverse impact on the existing J.D. program in Lansing; failed to explain how the findings it cited in support of its conclusion raised a serious doubt about Cooley's compliance with this standard and interpretation; elevated bar results to the status of an independent, determinative factor, contrary to Interpretation 301-1; ignored all other factors, such as the academic support programs that Cooley has implemented; and never analyzed all of these factors together to determine compliance with Standard 301, as Interpretation 301-1 requires. Cooley also submitted a request for a variance to Standard 302(f), which prohibits schools from requiring its students to take in-house bar preparation classes as a condition of graduation, so that Cooley could require its students, free of charge, to take the successful in-house bar preparation classes that it currently offered on a voluntary basis.

109. On August 5, 2004, Cooley's representatives appeared before the Council in two separate proceedings, first on the issue of sanctions and second on the issue of acquiescence in Cooley's satellite campus applications. President LeDuc specifically asked the Council to take special care in separating its prosecutorial and adjudicative functions and in protecting against any influence which the pending litigation might have on the Council's decision-making process.

110. The August 5, 2004 appearance on the issue of sanctions followed the same basic procedural format as that followed in the Accreditation Committee. During the appearance on the issue of acquiescence, the Council did not ask a single question

referencing Interpretations 105-3 and 105-4, which set forth the controlling requirements for satellite campuses, and asked only one question related to the merits of the Oakland and Grand Rapids programs. And although the Committee based its recommendation against acquiescence on bar results, the Council's main focus on appeal switched to academic attrition at the Lansing campus.

111. On August 17, 2004 the Council issued its action letters. With regard to the issue of sanctions, the Council increased the sanction recommended by the Committee without any additional findings or explanation, extending Cooley's ineligibility to operate satellite campuses at Oakland and Grand Rapids from September 2005, as recommended by the Committee, to July 31, 2006, effectively extending the period of ineligibility to the beginning of the September 2006 semester. The Council failed to provide "specific reasons" for why this increase in the Committee's recommended sanction was appropriate, as required by Rule 14(b). The Council's action letter also failed to address the arguments Cooley had raised in its motion regarding the Committee's lack of authority under Rule 13 to sanction a school that is currently in compliance with the standards; failed to address the arguments Cooley had raised in its motion in limine; failed to address the arguments and facts Cooley had submitted in its statement of mitigation; failed to address the extent to which the Council's own conduct had contributed to this dispute; failed to provide any rationale for the particular sanctions imposed; failed to consider the positive factual findings made by the Accreditation Committee about the Oakland and Grand Rapids programs in determining an appropriate sanction; failed to separate its prosecutorial and adjudicative functions; failed to follow any procedural safeguards to ensure that its own role in this matter and its status as a

43

party to the litigation did not influence its decision; and failed to address the arguments Cooley had raised about the procedural and due process violations committed by the Committee in the conduct of its proceedings.

112. With regard to the issue of acquiescence, the Council "declined to act" on the merits of Cooley's Oakland and Grand Rapids satellite campus applications because it said that it had extended the period of Cooley's ineligibility to operate satellite campuses until July 31, 2006, it had a serious concern about Cooley's bar passage results, and the present applications for acquiescence did not provide sufficient information upon which it could rely in making a decision that would not become applicable until 2006.  While the Council cited a "concern" with Cooley's bar passage rates, it did not conclude that Cooley was out of compliance with Standard 301(a) or Interpretation 301-1; did not attempt to establish any connection between the satellite programs and the performance of Cooley's Lansing graduates on the July 2003 and February 2004 bar examinations; failed to address any of the other arguments that Cooley raised in its July 22, 2004 submission; and failed to address the request for a variance that Cooley had submitted.  It also added a requirement that Cooley submit new applications for acquiescence and submit to a third fact-finding inspection before it would consider granting acquiescence in Cooley's Oakland and Grand Rapids satellite programs.

113. In the twenty-six months since Cooley first filed its original application for acquiescence, neither the Accreditation Committee nor the Council has made a single negative finding or conclusion that Cooley's satellite programs do not comply with the substantive requirements governing satellite campuses found in Interpretations 105-3 and 105-4.

## COUNT I
## VIOLATION OF COMMON LAW DUE PROCESS

114.    Cooley incorporates by reference paragraphs 1-113 of this First Amended Complaint.

115.    The Council of the ABA is an accrediting agency recognized by the Department of Education and must abide by the requirements of common law due process and fundamental fairness in making decisions that affect the substantial rights of a school and its students.

116.    The ABA's actions, decisions, findings, and conclusions that are made in violation of common law due process may be reversed or modified by this Court.

117.    This Court may also compel ABA action unlawfully withheld or unreasonably delayed.

118.    The ABA's actions, decisions, findings, and conclusions are reviewable to determine if they are supported by substantial evidence and may be reversed or modified by this Court if they are not supported by substantial evidence.

119.    The ABA's actions, decisions, findings, and conclusions are reviewable for an abuse of discretion and may be reversed or modified by this Court if they constitute an abuse of discretion.

120.    The ABA's actions, decisions, findings, and conclusions are reviewable under an arbitrary or capricious standard and may be reversed or modified by this Court if they are arbitrary or capricious.

121.    The ABA's actions, decisions, findings, and conclusions are reviewable to ascertain whether they were made without observance of procedure required by law, including the ABA's own internal rules, policies, practices, and procedures, and may be

45

reversed or modified by this Court if rendered contrary to those rules, policies, practices, and procedures.

122.    The ABA's actions, decisions, findings, and conclusions are reviewable to ascertain whether they are contrary to law and may be reversed or modified by this Court if they are contrary to law.

123.    The ABA has violated common-law due process requirements.

124.    The ABA lacked substantial evidence to support its actions, decisions, findings, and conclusions.

125.    The ABA abused its discretion by failing to consider all relevant factors, making clear errors in judgment, and by failing to act on Cooley's various applications, motions, and requests.

126.    The ABA acted in an arbitrary and capricious manner because it made decisions without fixed standards and principles and because the applicable standards and principles changed repeatedly and suddenly during the decision-making process without justification or explanation.

127.    The ABA violated its own internal rules, policies, practices, and procedures.

128.    The ABA acted contrary to law in taking its actions, in failing to take other actions it was required to take, and in failing to articulate the basis and justification for each action or inaction.

129.    The ABA has unlawfully withheld action and unreasonably delayed other action.

130.   Cooley has suffered damages as a result of the Council's violation of common-law due process requirements.

WHEREFORE, Cooley requests this Court to reverse the actions of the ABA; to permanently enjoin the ABA from imposing sanctions against Cooley or taking any action to restrict the operation of Cooley's two-year satellite programs at Oakland and Grand Rapids; to declare that Cooley's satellite campus applications meet all applicable ABA Standards and Interpretations; to order the ABA to grant acquiescence in the satellite campuses at Oakland and Grand Rapids; to order the ABA to grant acquiescence in the Oakland and Grand Rapids branch campus applications; and to require the ABA to schedule a site visit to review Cooley's request for provisional approval of its branch campus applications (which should have been completed by January 15, 2004 under the ABA's own rules) within 30 days after entry of the order granting acquiescence, to review those applications at the April 2005 Accreditation Committee meeting, and to make a decision on those applications at the June 2005 Council meeting. Cooley also requests this Court to award Cooley damages and any additional relief it deems appropriate, including costs, interest, and attorneys' fees sustained on account of having to bring this action.

## COUNT II
## BREACH OF CONTRACT (SETTLEMENT AGREEMENT)

131.   Cooley incorporates by reference paragraphs 1-130 of this First Amended Complaint.

132.   On April 16, 2004, the parties appeared in Court for the hearing of Cooley's Motion for Preliminary Injunction.

47

133.   During the hearing, the parties reached an agreement that resulted in Cooley's motion being denied as moot.  This agreement was confirmed in a Stipulation and Agreed Order filed with the Court.

134.   Among the terms of the Stipulation and Agreed Order, Cooley agreed immediately to reduce its programs at Oakland and Grand Rapids so that no student may earn more than 15 credit hours toward the J.D. degree at either or both locations.  Cooley also agreed that it would not reopen its satellite programs at Oakland or Grand Rapids to offer more than 15 credits without prior acquiescence of the Council.

135.   In conformity with the Stipulation and Agreed Order, Cooley reduced its programs at Oakland and Grand Rapids so that no student may earn more than 15 credit hours toward the J.D. degree at either or both locations.  Cooley certified that fact to the ABA in May 2004.  Furthermore, Cooley has not reopened its satellite programs at Oakland and Grand Rapids to offer more than 15 credits.

136.   The ABA agreed that the Accreditation Committee would consider and make a recommendation on the merits of Cooley's applications for acquiescence in the two-year satellite programs at its June 25-26, 2004 meeting, and that the Council would consider on the merits the Committee's recommendations at its August 5-6, 2004 meeting.

137.   On April 16, 2004, this Court recommended that the ABA, with respect to the pending Rule 13 show cause hearing, consider the substantive merits of the satellite applications in determining whether any sanction should be issued and what that sanction might be.

138.    In its most recent action letters, the Accreditation Committee made extensive and overwhelmingly favorable findings about the curriculum, student services, faculty, students, administration, library and information resources, finances, and facilities at both Oakland and Grand Rapids.

139.    But the Accreditation Committee failed to apply Interpretations 105-3 and 105-4, which set forth the substantive requirements for satellite campuses, to the factual findings the Committee made about the satellites, and did not make any determination or recommendation on the merits whether the Oakland and Grand Rapids programs satisfied these requirements, in breach of the Stipulation and Agreed Order.

140.    In its August 17, 2004, action letter, the Council "declined to act" on Cooley's pending satellite campus applications, in breach of the Stipulation and Agreed Order.

141.    The ABA has therefore breached its contract.

142.    Cooley has suffered damages as a result of the ABA's breach of contract.

WHEREFORE, Cooley requests this Court to reverse the actions of the ABA; to permanently enjoin the ABA from imposing sanctions against Cooley or taking any action to restrict the operation of Cooley's two-year satellite programs at Oakland and Grand Rapids; to declare that Cooley's satellite campus applications meet all applicable ABA Standards and Interpretations; to order the ABA to grant acquiescence in the satellite campuses at Oakland and Grand Rapids; to order the ABA to grant acquiescence in the Oakland and Grand Rapids branch campus applications; and to require the ABA to schedule a site visit to review Cooley's request for provisional approval of its branch campus applications (which should have been completed by January 15, 2004 under the

ABA's own rules) within 30 days after entry of the order granting acquiescence, to review those applications at the April 2005 Accreditation Committee meeting, and to make a decision on those applications at the June 2005 Council meeting. Cooley also requests this Court to award Cooley damages and any additional relief it deems appropriate, including costs, interest, and attorneys' fees sustained on account of having to bring this action.

**COUNT III**
**VIOLATION OF THE HIGHER EDUCATION ACT (20 § U.S.C. § 1099b)**

143.   Cooley incorporates by reference paragraphs 1-142 of this First Amended Verified Complaint.

144.   The Council of the ABA is an accrediting agency under 20 U.S.C. § 1099b and is recognized by the United States Department of Education as the accrediting agency for professional law-degree programs.

145.   As an accrediting agency, the Council is obligated to comply with the Higher Education Act and the regulations promulgated thereunder.

146.   Under the Higher Education Act ("HEA"), the Council must "apply procedures throughout the accrediting process, including evaluation and withdrawal proceedings, that comply with due process, including . . . adequate specification of requirements and deficiencies at the institution of higher education or program being examined." 20 U.S.C. § 1099b(a)(6)(A).   The Council is also bound to ensure consistency in its decision making and is therefore required to have effective controls against the inconsistent application of its standards, to base its accreditation decisions based on published standards, and to ensure that the information it is relying on in making an accreditation decision is accurate. 34 C.F.R. § 602.18.  Finally, the Council is

obligated to notify Cooley in writing of the results of any decision or appeal and the basis for that result. 34 C.F.R. § 602.25.

147.    The Council violated the HEA by failing to employ procedures in this matter that comply with due process, failing to provide Cooley with adequate specification of requirements and deficiencies in its satellite programs, failing to ensure consistency in its decisions regarding satellite applications submitted by different schools, failing to have effective controls against inconsistent application of its standards, interpretations, and rules to applications submitted by different schools, failing to base its decisions on published standards available equally to all schools, and failing to ensure that the information it relied on in making its decisions was accurate.

148.    Cooley has suffered damages as a result of the Council's violation of the HEA.

WHEREFORE, Cooley requests this Court to reverse the actions of the ABA; to permanently enjoin the ABA from imposing sanctions against Cooley or taking any action to restrict the operation of Cooley's two-year satellite programs at Oakland and Grand Rapids; to declare that Cooley's satellite campus applications meet all applicable ABA Standards and Interpretations; to order the ABA to grant acquiescence in the satellite campuses at Oakland and Grand Rapids; to order the ABA to grant acquiescence in the Oakland and Grand Rapids branch campus applications; and to require the ABA to schedule a site visit to review Cooley's request for provisional approval of its branch campus applications (which should have been completed by January 15, 2004 under the ABA's own rules) within 30 days after entry of the order granting acquiescence, to review those applications at the April 2005 Accreditation Committee meeting, and to

make a decision on those applications at the June 2005 Council meeting. Cooley also

requests this Court to award Cooley damages and any additional relief it deems

appropriate, including costs, interest, and attorneys' fees sustained on account of having

to bring this action.

### COUNT IV
### BREACH OF CONTRACT (ACQUIESCENCE IN SATELLITE AND BRANCH APPLICATIONS)

149.    Cooley incorporates by reference paragraphs 1-148 of this First Amended

Verified Complaint.

150.    Cooley tendered its satellite applications to the ABA on the forms

provided by the ABA, along with the $8,000 application fee for each application, based

on the proposed satellite campus interpretations, as directed by the ABA and mutually

agreed-upon by the parties, and based on the ABA's Rules of Procedure for Approval of

Law Schools.

151.    The ABA accepted those applications and the accompanying forms and

fees as submitted and thereby became contractually obligated to process Cooley's

applications as submitted based on the understanding of the parties and based on its own

rules of procedure.

152.    The ABA breached this agreement by refusing to apply the proposed

satellite interpretations, refusing to consider Cooley's two-year applications as submitted,

and refusing to follow the Rules of Procedure for the Approval of Law Schools.

153.    Cooley also tendered its branch campus applications to the ABA on the

forms provided by the ABA, along with the $8,000 application fee for each application,

based on the Rules of Procedure for the Approval of Law Schools.

154.    The ABA accepted those applications and the accompanying forms and fees as submitted, and thereby became contractually obligated to process Cooley's applications based on its own rules of procedure.

155.    The ABA has breached this agreement by refusing to process Cooley's branch campus applications as required by the ABA's own rules.

156.    Cooley has suffered damages as a result of the ABA's breach of these agreements.

WHEREFORE, Cooley requests this Court to reverse the actions of the ABA; to permanently enjoin the ABA from imposing sanctions against Cooley or taking any action to restrict the operation of Cooley's two-year satellite programs at Oakland and Grand Rapids; to declare that Cooley's satellite campus applications meet all applicable ABA Standards and Interpretations; to order the ABA to grant acquiescence in the satellite campuses at Oakland and Grand Rapids; to order the ABA to grant acquiescence in the Oakland and Grand Rapids branch campus applications; and to require the ABA to schedule a site visit to review Cooley's request for provisional approval of its branch campus applications (which should have been completed by January 15, 2004 under the ABA's own rules) within 30 days after entry of the order granting acquiescence, to review those applications at the April 2005 Accreditation Committee meeting, and to make a decision on those applications at the June 2005 Council meeting.  Cooley also requests this Court to award Cooley damages and any additional relief it deems appropriate, including costs, interest, and attorneys' fees sustained on account of having to bring this action.

## COUNT V
## NEGLIGENT MISREPRESENTATION

157. Cooley incorporates by reference paragraphs 1-156 of this First Amended Verified Complaint.

158. The ABA, and its Consultant, John Sebert, made representations to Cooley that:

     a.    Cooley's application and the First ABA Report, both of which were based on the proposed satellite interpretations, were in the proper form and were based on the proper interpretations for determining whether acquiescence should be granted, and contained sufficient facts and observations to enable the Accreditation Committee and the Council to determine whether acquiescence should be granted;

     b.    Cooley's application would be reviewed in accordance with the proposed interpretations governing satellite programs and the Rules of Procedure for the Approval of Law Schools;

     c.    Past issues regarding Cooley's compliance with standards governing admissions would not be raised to block any applications for new programs that Cooley might submit; and

     d.    Cooley's applications for two-year satellite programs would be considered as submitted if Cooley so desired.

159. To its detriment, Cooley relied on these representations by the ABA and John Sebert.

54

160.    The ABA and John Sebert also provided the Accreditation Committee with false and materially misleading information about Cooley and falsely advised the Committee that Rule 19(d), which was the basis for Cooley's position that prior acquiescence was not required, had been deleted when in fact it had not been deleted.

161.    The ABA and John Sebert owed Cooley a duty to exercise reasonable care in providing information to Cooley about how the ABA would review and process Cooley's applications for acquiescence and in providing information to the Accreditation Committee about Cooley and about the Rules of Procedure for the Approval of Law Schools.

162.    The ABA and John Sebert failed to exercise reasonable care in providing information to Cooley about its application for acquiescence and the review process and in providing information to the Accreditation Committee about Cooley and about the Rules of Procedure for the Approval of Law Schools.

163.    Cooley has suffered damages as a result of the failure of the ABA and John Sebert to exercise reasonable care.

WHEREFORE, plaintiff Thomas M. Cooley Law School respectfully requests the Court to award damages against the ABA and John Sebert and any additional relief it deems appropriate, including costs, interest, and attorneys' fees sustained on account of having to bring this action.

## COUNT VI
## EQUITABLE ESTOPPEL

164.    Cooley incorporates by reference paragraphs 1–163 of this First Amended Verified Complaint.

55

165. The Consultant and his staff are "responsible for ensuring that schools desiring ABA approval have the information necessary to facilitate their compliance with the Standards for Approval of Law Schools."

166. The Accreditation Committee is obligated to issue action letters that contain the specific reasons for a decision that is adverse to a law school.

167. When Cooley first applied for acquiescence, it was still on reporting status to the ABA arising from its 1998 sabbatical inspection with respect to admissions standards, pursuant to Standard 501. In the first Committee and Council action letters, the ABA did not cite this status as a ground to deny acquiescence.

168. On remand, in the second Committee and Council action letters, the ABA for the first time raised this reporting status as a ground (although it had promised not to do so), but also denied acquiescence on the grounds, among other things, that "Cooley has not established that it has secured adequate facilities," "has not established that it will provide a full-time faculty," "has not established that it will provide adequate library personnel and services," and "has not established that student services for the Oakland program are adequate and comparable to those provided at Lansing."

169. Cooley justifiably relied on the ABA's representation that Cooley's reporting status would not be an absolute bar to acquiescence.

170. Cooley also justifiably relied on the representations made by the Consultant's Office that Cooley should submit its satellite application based on the proposed interpretations governing satellite programs and that Cooley's timetable for starting its satellite program at Oakland University in September of 2002 was viable.

56

171. Cooley justifiably relied on the acceptance by the Consultant of Cooley's application as submitted as a full and complete application meeting all form and content requirements for such an application.

172. Cooley justifiably relied on the acceptance by the Consultant of the First ABA Report as a full and complete site inspection report meeting all requirements to enable the Accreditation Committee and the Council to acquiesce in Cooley's application.

173. Cooley justifiably relied on the Consultant's promises that admissions issues would not be raised to block any applications for new programs that Cooley might submit.

174. Cooley justifiably relied on the demands made by the Accreditation Committee and the Council requiring Cooley to demonstrate, beyond the plans and documentary materials it had submitted, that its programs met all applicable requirements.

175. Cooley justifiably relied on the fact that it provided the Consultant with clear notice of its intent to proceed to implement its programs and that the Council, which is the only entity that can make an official, definitive, and authoritative interpretation of the Rules of Procedure for the Approval of Law Schools, failed to issue timely any interpretation of Rule 19(d), despite Cooley's request that it do so, until December 17, 2003.

176. In reliance on these actions, representations, demands, and failure to take action by the ABA, Cooley started its program at Oakland in September 2002 by offering the first twelve credits of instruction, proceeded to secure firm, definite, and binding

57

contractual agreements with Oakland University and Western Michigan University for its satellite programs, as specifically required by the Accreditation Committee and the Council, and as of the end of January 2004 has spent $5.5 million dollars to demonstrate compliance with the standards and interpretations cited by the Committee and the Council, including the construction and renovation of appropriate physical facilities, the purchase and installation of two complete law school libraries, and the hiring of faculty members, administrators, student services providers, and library staff to operate these programs.

177.   The ABA is equitably estopped to deny to Cooley acquiescence in the satellite programs and to fail to process the applications for the branch campuses.

WHEREFORE, Cooley requests this Court to reverse the actions of the ABA; to permanently enjoin the ABA from imposing sanctions against Cooley or taking any action to restrict the operation of Cooley's two-year satellite programs at Oakland and Grand Rapids; to declare that Cooley's satellite campus applications meet all applicable ABA Standards and Interpretations; to order the ABA to grant acquiescence in the satellite campuses at Oakland and Grand Rapids; to order the ABA to grant acquiescence in the Oakland and Grand Rapids branch campus applications; and to require the ABA to schedule a site visit to review Cooley's request for provisional approval of its branch campus applications (which should have been completed by January 15, 2004 under the ABA's own rules) within 30 days after entry of the order granting acquiescence, to review those applications at the April 2005 Accreditation Committee meeting, and to make a decision on those applications at the June 2005 Council meeting. Cooley also requests this Court to award Cooley damages and any additional relief it deems

appropriate, including costs, interest, and attorneys' fees sustained on account of having
to bring this action.

## VERIFICATION

STATE OF MICHIGAN )
                      ) ss
COUNTY OF OAKLAND )

      John Nussbaumer, being first duly sworn, deposes and says:

      1.    I was the Associate Dean of Faculty of Plaintiff Thomas M. Cooley Law

School until April 30, 2003 and since then have served as the Associate Dean at

Rochester/Oakland University.

      2.    I am authorized by Thomas M. Cooley Law School to verify this First

Amended Verified Complaint for Injunctive and Other Relief; and

      3.    I have read the foregoing First Amended Verified Complaint for

Injunctive and Other Relief. I verify under penalty of perjury that the allegations

contained in the First Amended Verified Complaint for Injunctive and Other Relief are

true and correct to the best of my knowledge, information and belief, and if sworn as a

witness, I can testify competently as to the facts in the First Amended Verified Complaint

for Injunctive and Other Relief.

John Nussbaumer

Subscribed and sworn to before me this 26th day of August, 2004.

Renata C. Erickson

Notary Public, Oakland County, Michigan
My Commission Expires: _____

RENATA C. ERICKSON
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Nov 22, 2010
ACTING IN THE COUNTY OF
Oakland

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: _____
Michael W. Hartmann (P25373)
Sonal Hope Mithani (P51984)
Attorneys for Plaintiff,
Thomas M. Cooley Law School
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 963-6420

Dated:  August 26, 2004


## JURY DEMAND

NOW COMES the Plaintiff, Thomas M. Cooley Law School, by and through the

undersigned counsel, and demand trial by jury on all issues for which it is entitled to a

jury.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: _____
Michael W. Hartmann (P25373)
Sonal Hope Mithani (P51984)
Attorneys for Plaintiff
150 West Jefferson, Suite 2500
Detroit, MI 48226

61

### PROOF OF SERVICE

*I hereby certify that on August 26, 2004, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: William K. Holmes, Daniel R. Gravelyn, Sarah M. Riley, Warner Norcross & Judd, LLP, 900 Fifth Third Center, 111 Lyon Street, N.W., Grand Rapids, MI 49503-2487, and I hereby certify that I have mailed by United States Postal Service the papers to the following non-ECF participants: David T. Pritikin, Anne E. Rea, Kathleen L. Roach, Sidley Austin Brown & Wood, LLP, Bank One Plaza, 10 South Dearborn Street, Chicago, IL 6060.*

*s/Michael W. Hartmann (P-25373)*
*Miller, Canfield, Paddock & Stone, PLC*
*150 W. Jefferson Ave., Ste. 2500*
*Detroit, MI 48226*
*(313) 963-6420*
*Hartmann@millercanfield.com*